THOMAS WHITRIDGE AND OTHERS, CLAIMANTS OF THE SCHOONER FANNIE CROCKER, APPELLANTS, *v.* JOSHUA DILL AND OTHERS.

In a collision which took place between two schooners in the Chesapeake bay, the colliding vessel, being the larger, and fastest sailer, and attempting to pass the smaller to windward, was in fault, because there was not a sufficient lookout.

The absence of a lookout is not excusable, because of an accident which had happened, and which required all hands to be called to haul in the damaged mainsail.

She was also in fault, because, being not sufficiently to the windward to have passed the other vessel in safety, she did not seasonably give way and pass to the right, the wind being from the northwest, and both vessels directing their course north by east, the smaller vessel laying one point closer to the wind than the larger.

Where a vessel astern, in an open sea and in good weather, is sailing faster than the one ahead, and pursuing the same general direction, if both vessels are close hauled on the wind, the vessel astern, as a general rule, is bound to give way, or to adopt the necessary precautions to avoid a collision.

Cases cited to illustrate this principle.

THIS was an appeal from the Circuit Court of the United States for the district of Maryland.

It was a libel filed in the District Court by Joshua Dill and ten others, owners of the schooner Henry R. Smith, against the schooner Fannie Crocker, for running down and sinking the schooner Henry R. Smith.

The facts of the case are stated in the opinion of the court.

The District Court decreed against the Fannie Crocker, and this decree was affirmed by the Circuit Court. Whitridge and the other owners appealed to this court.

It was argued by *Mr. Brune*, upon a brief filed by *Brown* and *Brune*, for the appellants, and by *Mr. Latrobe* for the appellees.

Mr. Justice CLIFFORD delivered the opinion of the court.

This is an appeal from a decree of the Circuit Court of the United States for the district of Maryland. The libel was filed in the District Court on the thirty-first day of March, 1855. It was a proceeding *in rem* against the schooner Fannie Crocker, and was instituted by the libellants, as the owners of the schooner Henry R. Smith, to recover damages on account of a collision which took place between those vessels on the ninth day of March, 1855, in the Chesapeake bay, whereby the latter vessel was run down and totally lost. As alleged by the libellants, their vessel sailed the day previous to the collision, from Hampton roads, in the State of Virginia, laden with a valuable cargo of oysters, and bound on a voyage to New Haven, in the State of Connecticut.

They also allege, that at half past eight o'clock, in the evening of the day of the collision, the wind being then from the northwest, and blowing a fresh breeze, and when their schooner was heading one point to the eastward of north, close hauled on the wind, another schooner was seen on their larboard quarter, about one-third of a mile distant; that the strange schooner sailed faster than the vessel of the libellants, and soon came up with and abeam of their vessel, when she put her helm up, bore away, and coming down on the vessel of the libellants, head on, struck her abreast the cabin, and so damaged her that she sunk in a few minutes, leaving the master and crew only time to escape on board the colliding vessel.

Many other facts and circumstances are stated in the libel to show that those on board the vessel of the libellants were

not in fault, and that the collision was occasioned wholly through the unskilfulness and negligence of those in charge of the vessel of the claimants. In their answer, the claimants admit the collision, and that the vessel of the libellants was lost, but they deny that the circumstances attending the disaster are truly stated in the libel.

According to their account of the circumstances, it became necessary for the Fannie Crocker, between eight and nine o'clock in the evening of that day, and just before the collision, to tack, in order to alter her course. At that time, as they allege, she was heading towards the southern and western shore, but being under a double-reef mainsail, foresail, and jib, and in ballast trim, she failed to go round. Similar attempts, as they allege, were several times repeated, but without success. Finding that the vessel would not go round, the master then gave the order to wear ship, and in executing that order the main peak was lowered to enable the vessel to wear rapidly; but when the main boom passed over the deck, the wind caught the sail and threw it over the main gaff, and tore the sail from the leach-rope, rendering it perfectly useless. While assisting to execute this order, one of the seamen had his leg caught in the fore-sheet, and was severely injured, when all hands, except the master, who was at the wheel, went to relieve the seaman. After disengaging the seaman from his dangerous situation, the rest of the hands, as the claimants allege, were called to haul in the mainsail, which was then dragging in the water, and at this juncture another vessel, which subsequently proved to be the schooner of the libellants, was seen on the starboard quarter of the claimants' vessel, some three or four lengths off. In order to prevent the two vessels from coming in contact, the claimants allege that the helm of their vessel was put hard up, with a view to go to the stern of the strange vessel; but the effort was unavailing, and the two vessels came together, and, as the claimants allege, wholly through the carelessness and unskilful management of those in charge of the other vessel, in not altering their course in proper time to avoid a collision.

Some particularity has been observed in stating the defence,

in order that the respondents may have the full benefit of the position they have assumed.

Two witnesses only were examined, on the part of the libellants, in respect to the circumstances of the disaster. In the District Court a decree was entered for the libellants, allowing them the full value of their vessel and cargo; and on appeal to the Circuit Court, that decree was affirmed. Whereupon the respondents appealed to this court.

From the pleadings and evidence, it satisfactorily appears that the Henry R. Smith was a schooner of one hundred and thirty-four tons, and that she was laden with oysters, and bound on a voyage to New Haven, in the State of Connecticut. She was a stanch vessel, well manned and equipped, showed a proper light at the time of the collision, and had a sufficient and competent lookout. On the other hand, the Fannie Crocker was a schooner of two hundred and twenty-two tons, sailing in ballast, and was bound on a voyage from Dighton, in the State of Massachusetts, to Baltimore, in the State of Maryland. Like the other vessel, she was stanch, and well manned and equipped, but failed to show a light at the time of the collision, and had no sufficient lookout stationed on any part of the vessel. All of the witnesses state that the night was clear, and that there was no difficulty in seeing objects without lights at considerable distance. They mention no circumstance tending to authorize the conclusion that the collision can be justified or excused on account of the character of the night or the difficulties of the navigation. Occurring, as it did, inside of the capes, in the open bay, of a clear night, with no difficulties to encounter, except a fresh breeze from the northwest, it is obvious that one or both of the vessels must be in fault. They were both sailing in the same general direction; but the vessel of the respondents, being in ballast, and the larger of the two, was moving through the water at the greater speed. She was astern of the other vessel, and somewhat to the windward, but was sailing on a line converging to the track of the other vessel; and both vessels were close hauled on the wind.

Terry, the mate of the libellant's vessel, says when he first

saw the other schooner, she was half a mile distant on the weather quarter. At that time both vessels were on the wind, and standing the same way—to the northward and eastward. According to his account, the vessel of the respondents sailed faster than the vessel of the libellants, and ran down until she got abreast of her to the windward, when she was about fifty rods distant. He also states, that when they first saw that she was coming down on them, they put the helm of their vessel up, and tried in every way to keep clear of her, but could not, as she had fallen off from her course, and was then before the wind.

Another witness (a seaman) was also examined by the libellants. His testimony substantially confirms the mate, and clearly shows that the vessel of the libellants was ahead, and that the other vessel was to the windward, and moving through the water much faster than the vessel of the libellants.

Both witnesses testify in effect that the approaching vessel, when she was nearly abreast of their vessel, fell off and struck the vessel of the libellants on the larboard quarter, as alleged in the answer. They both affirm that they had a sufficient and competent lookout and proper lights.

Several witnesses were also examined on the part of the respondents. Their account of the circumstances attending the disaster differs in several particulars from that given by the witnesses examined by the libellants. They all agree, however, that the vessel of the libellants was not seen by any one on board their vessel until she was so near that all efforts on their part to prevent a collision were unavailing.

In effect, they also admit that their vessel, at the time of the collision, had no lookout engaged in the performance of that duty. On this latter point, the master says that he had directed the steward, a colored man, to keep a lookout, and adds, that he was somewhere about the main deck. But all hands had been called to haul in the mainsail, and the second mate states that he first saw the vessel of the libellants while he was engaged with the other hands in endeavoring to accomplish that object. When he saw the vessel, he says she was only about three times the length of his vessel off.

At that time, all the hands, except the steward, were aft the mainsail, where they could not see the other vessel without changing their position. She was first descried by the second mate as he stepped up on to the "lazy board," so called, in order to haul up the damaged sail. He then cried out to the master to put the helm down, but the mate at the same time sung out to put the helm up. In this confusion, the master adopted the suggestion of the mate; and he admits that the steward, when the alarm was given, came running aft, and assisted him in changing the helm.

Two other witnesses state that the steward assisted the master in putting up the helm; and one of them says that no particular person was keeping watch, and attempts to justify the neglect upon the ground that it is not customary to have a man forward when all hands are called to take in the sails.

Suffice it to say, without entering more into detail, that the testimony of the respondents shows conclusively that their vessel had no sufficient lookout at the time of the collision; and the second mate, who first discerned the vessel of the libellants, testifies, without qualification, that if they had seen her three or four minutes sooner, they could have cleared her and prevented a collision.

From these facts, which are proved beyond doubt, it necessarily follows that the vessel of the respondents was in fault. She had no lookout; and the neglect of that precaution contributed to the disaster, and in all probability was the sole cause that produced it.

2. Assuming that the vessel of the respondents was not sufficiently to the windward to have passed the other vessel in safety, then she was also in fault, because she did not seasonably give way, and pass to the right. Where a vessel astern, in an open sea and in good weather, is sailing faster than the one ahead, and pursuing the same general direction, if both vessels are close hauled on the wind, the vessel astern, as a general rule, is bound to give way, or to adopt the necessary precautions to avoid a collision. That rule rests upon the principle that the vessel ahead, on that state of facts, has the sea-way before her, and is entitled to hold her position;

and consequently the vessel coming up must keep out of the way.

Speaking of steamers, Judge Betts said, in the case of the Governor, Abbott's Adm. R., 110, that the fact that they were running in the same direction, the one astern of the other, imposed upon the rear boat an obligation to precaution and care, which was not chargeable, to the same extent, upon the other. He accordingly held, that a vessel in advance is not bound to give way, or to give facilities to a vessel in her rear, to enable such vessel to pass; but that the vessel ahead is bound to refrain from any manœuvres calculated to embarrass the latter vessel while attempting to accomplish that object. Similar views had previously been announced by the same learned judge, in the case of the steamboat Rhode Island, decided in 1847. In that case, it is said the approaching vessel, when she has command of her movements, takes upon herself the peril of determining whether a safe passage remains for her beside the vessel preceding her, and must bear the consequences of misjudgment in that respect. No immunity is extended by the law to the one possessing the greater speed; and so far from encouraging the exercise of the power to its utmost, the law cautiously warns and checks vessels propelled by steam against an improvident employment of speed, so as to involve danger to others, being stationary or moving with less velocity. Olcott's Adm. R., p. 515.

That case was appealed to the Circuit Court, where it was affirmed. The Rhode Island, 1 Blatch. C. C., 363.

Emerigon says, a ship going out of a port last is to take care to avoid the vessel that has gone out before her, and he mentions the case of a small vessel which went out of the port of Marseilles, and in tacking struck a boat that went out before her, which was also tacking. Claim for damages was made by the boat, and the judges were of opinion that the vessel going out last is to take care to avoid the one before it. Emerigon, chap. 12, sec. 14, p. 330. Other continental authorities may be cited to the same effect. Whether it be by night or day, says Valin, b. 2, p. 578, the ship that leaves after another, and follows her, should take care to avoid a collision,

without which she will have to answer in damages. Sibille de Abordage, sec. 249.

We are not aware that the precise question presented in this case has been ruled by any of the Federal courts. Remarks are certainly to be found in the opinion of the court in the case of the Clement, 17 Law Rep., 444, which are inconsistent with the proposition here laid down. That case was appealed to the Circuit Court, and was there affirmed. But the remarks to which we refer were not necessary to the decision of the cause, and we think they must be received with some qualification. The Clement, 2 Cur. C. C., 368, sec. 1; Pars. Mar. Law, p. 197, note 2.

Without further discussion of the general principle at the present time, it will be sufficient to say, that we are satisfied that the rule assumed in this case is one well calculated to prevent collisions, and that it is one which ought to be constantly observed and enforced in all cases where it is applicable. That exceptional cases may arise is not at all improbable; but it will be the proper time to consider them when they are presented for decision. For these reasons, we are of the opinion that the vessel of the respondents was wholly in fault. Objection was made to the damages as excessive, on the ground that the vessel might have been raised from where she was sunk. After a careful examination of the testimony, we think the objection cannot be sustained.

The decree of the Circuit Court is therefore affirmed with costs