## SIMPSON *v.* SPRECKELS and others.

### (*District Court, D. California.* August 7, 1882.)

COLLISION—OVERTAKING VESSEL—DUTY TO AVOID COLLISION.

A vessel overtaking another is required to keep out of the way of that vessel, and steps to avoid collision must be taken in season, and the burden of proof, in case of an accident, is on the overtaking vessel to show diligence on her part and negligence on the part of the other vessel. Doctrine applied to a case where the overtaking vessel was more heavily laden and deeper in the water than the other vessel, and both were drifting with a strong ebb-tide, with a heavy swell from the opposite direction, and the wind light and variable.

In Admiralty.

*James C. Perkins,* for libelant.

*C. Temple Emmett* and *Jas. Wheeler,* for respondents.

HOFFMAN, D. J. · At about 6 A. M. on the sixth day of March, 1881, the steam-tug Hercules took in tow the libelant's brig Rival, and the respondent's schooner Rosario, and proceeded to sea. The schooner Rosario was dropped at or near the nine-fathom buoy, and the brig Rival about one mile and a half further out, or to the S. W. At this time, about 8 o'clock A. M. of the same day, a strong ebb-tide was running to the S. W., and a heavy swell setting in from the S. W. The wind was light and variable from the S. E., or S. S. E. The Rosario was heavily laden and deep in the water. The Rival was light. The influence of the tide was, therefore, most strongly felt by the Rosario, while that of the S. W. swell operated most strongly on the Rival. The course made, or attempted to be made, by the Rosario

was W. by S., while that of the Rival was about W. N.·W.   But the wind was too light to afford perfect steerage way to either vessel, and for some time before the collision there appears to have been no wind. At about the moment of the collision a puff of wind sprung up from the S. W.   Whether this occurred before or after the vessel struck is disputed.   About 10 o'clock A. M. the vessels collided.   The port cat-head of the Rosario struck the Rival on the starboard side of the stern-post.   Recoiling, she again struck her bow directly upon the stern-post of the Rival.   Again recoiling, she struck the Rival on the port side of the stern-post, and rubbed along the port side of the latter until the bows of the two vessels came together, when they swung clear of each other.   The vessels were in full view of each other from the time of starting until the collision.

The foregoing narrative is derived from the answer of the respondents, and from the statement of "undisputed facts" contained in the written brief of their advocate.

It is, I think, apparent that both vessels were sailing, or perhaps drifting, in the same general direction, and the Rosario drawing more water than the Rival, and therefore more influenced by the current and less by the swell, gradually overtook the Rival, on whom those forces acted with a reversed effect.   The Rosario was therefore clearly within the rule which requires every vessel overtaking another vessel to keep out of the way of the last-mentioned vessel, (article 17, rules 1864;) and the burden of proof, in cases of accident, is on her to show diligence on her own part and negligence on the part of the other vessel.   *The Governor,* Abb. Adm. 108.   It is not only her duty to take steps to avoid the collision, but she must do so *in season.* *Whettridge* v. *Dell,* 23 How. 418.   "A ship going out of port," says Emerigon, "is to take care to avoid the vessel that has gone out before her."   Emerigon, c. 12, § 14, p. 330.   And Valin says, (section 2, p. 578:) "Whether it be by night or day, the ship that leaves after another and follows her should take care to avoid a collision, without which she will have to answer in damages."   See opinion of Mr. Justice Clifford, 23 How. 454.

As the collision did not occur until about two hours after the tug dropped the Rival a mile and a half ahead of the Rosario, it is evident that the latter approached the former very gradually.   There was thus ample time for the Rosario to have taken means to prevent the collision as soon as it seemed likely to occur, and before the danger became imminent.   Both vessels were on or near the bar. Had the Rosario seasonably dropped an anchor all danger of collision

would have been avoided; and this simple precaution it was clearly her duty as the vessel astern to take.

The cause of the collision is, I think, clearly revealed by the mate of the Rosario. He testifies that when the vessels were about one-eighth or a quarter of a mile apart the master of the Rival called out to the master of the Rosario to drop his anchor, to which the latter replied by telling him to drop *his*. Capt. Swift, of the Rosario, testifies to the same effect. He states that about five minutes before the collision Capt. Adams called out to him to drop his anchor; and when asked why he did not do so, he answers: "Capt. Adams, of course, had charge of his ship, and I had charge of mine. Perhaps we saw things in a little different way. I don't know that I should obey Capt. Adams. Why didn't he anchor his ship? As I supposed he was going to drift clear of me as he was going across my bow, I didn't cast my anchor. I supposed he would drift on to me if I had done so." Record notes, p. 78.

This last intimation, that in his opinion it would have been imprudent to drop his anchor, is hardly consistent with the admitted fact that he did let go his anchor, by which, as he states, the vessel was brought up before the collision. If the depth of water was as claimed by the respondents, it was impossible that the vessel could have been brought up with the length of chain then ranged before the windlass, unless we accept Mr. Pauzus' statement that he paid out 45 fathoms of chain before the collision, and that "it fetched her up." This operation he does not pretend to have commenced until the vessels had approached within one and a half or probably two ships' lengths of each other. But the fact that it was resorted to, although too late, is a sufficient answer to Capt. Swift's suggestion that by dropping anchor the chances of collision would have been increased.

The answer alleges as a fault on the part of the Rival that immediately before the collision she attempted to tack, and, failing to do so, was taken aback and drifted down on the Rosario. But this is denied by all on board the Rival, and, under the circumstances, it seems almost impossible that she should have made any such attempt.

It appears from all the testimony that there was little or no wind—not enough to afford good steerage way to either vessel. No captain in his senses would have attempted to tack under such circumstances. If, as some of the witnesses state, a puff came out from the southwest just before the collision, it gave the Rival a fair wind, as her course lay to the northward and westward. She had, therefore, no motive to tack, even if the maneuver had been practicable.

The testimony in the case is quite voluminous. There are, as usual, many contradictions and discrepancies in the statements of the witnesses, even when testifying on the same side. But the principal facts of the case can be clearly discovered. The Rosario, going out behind the Rival, overtook and ran into her through neglect of measures to avoid her which the law called on her master to adopt.

Decree for libelants. Cross-libel dismissed.

---

### Counterfeiting—Essential Allegations.

UNITED STATES v. CARLL, U. S. Sup. Ct., Oct. Term, 1881. On certificate of division in opinion between the judges of the circuit court of the United States for the southern district of New York. The indictment was brought under section 5431 of the Revised Statutes. The decision was rendered by the supreme court of the United States on April 24, 1882. Mr. Justice *Gray* delivered the opinion of the court.

In an indictment upon a statute it is not sufficient to set forth the offense in the words of the statute unless those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished; and the fact that the statute in question, read in the light of the common law and of other statutes on the like matter, enables the court to infer the intent of the legislature, does not dispense with the necessity of alleging all facts necessary to bring the case within that intent. The offense at which the statute is aimed is similar to the common-law offense of uttering a forged or counterfeit bill, and knowledge that the instrument is forged and counterfeited is essential to make out the crime, and the omission to allege that the defendant knew the instrument which he uttered to be false, forged, and counterfeit, fails to charge him with any crime.

S. F. Phillips, Solicitor General, for the United States.

William C. Roberts, for accused.

Cases cited in opinion: U. S. v. Cruikshank, 92 U. S. 542; U. S. v. Simmons, 96 U. S. 360; Com. v. Clifford, 8 Cush. 215; Com. v. Bean, 14 Gray, 52; Com. v. Filburn, 119 Mass. 297.

### Practice—Rehearing.

CHICAGO, D. & V. R. Co. and others v. FOSDICK, U. S. Sup. Ct., Oct. Term, 1881. Appeal from the circuit court of the United States for the northern district of Illinois. On petition for a rehearing. The decision was rendered by the supreme court of the United States on May 8, 1882. Mr. Justice *Matthews* delivered the opinion of the court, granting the application, on the ground that the record on which the case was decided was not complete.

Lawrence, Campbell & Lawrence and Henry Crawford, for the petition.