## THE CITY OF MERIDA.[1]

### (*District Court, S. D. New York.* June 5, 1885.)

1. COLLISION—OVERTAKING VESSEL—EXHIBITION OF TORCH—REV. ST. § 4234.

    Section 4234, Rev. St., requiring the exhibition of a lighted torch, is designed to furnish an additional safeguard against collision, not to dispense with any of the previous obligations of diligence on the part of an overtaking vessel to keep out of the way of a vessel ahead. Though the latter fail to exhibit a torch, as required, the burden is still upon the former to show that she used all reasonable diligence to avoid the vessel ahead, as required by rule 22, § 4233.

2. SAME—BURDEN OF PROOF—NEGLIGENT LOOKOUT—APPORTIONMENT.

    About 1 o'clock on the morning of the eleventh of April, 1883, the night being overcast and dark, but without fog, the steamer City of M., bound to New York, was some 60 miles north-east of Cape Hatteras, and going about 10 knots an hour, on a course N. by E. At the same time, the schooner M. J. R. was sailing by the wind on a course varying from N. N. E. to N. E. by N., and making about 4 knots an hour. The lookout of the schooner testified that he saw only the steamer's green and mast-head lights about a point off the schooner's starboard quarter. No torch was exhibited by the schooner; her master supposing, as he said, that the steamer would pass astern of him. The schooner was not seen by those on the steamer till the vessels were a short distance apart, when the wheel of the steamer was ported and her engine stopped, notwithstanding which her stem struck the schooner aft on the starboard side, causing injuries which rendered the schooner a total loss, and compelled the steamer to put in towards Norfolk, where she was beached to prevent sinking. This action was brought against the steamer by the owners of the schooner. The testimony as to the navigation of the two vessels was in irreconcilable conflict. *Held*, that faults on the part of both vessels caused the collision; that if, as alleged by the schooner, the green light of the steamer was visible for some nine minutes prior to the collision, bearing continually *in the same direction*, the schooner's men should have known from that fact that the steamer was circling round and overtaking them, instead of crossing astern, and should have exhibited a torch; that the steamer was also in fault, as the fact that no torch was shown her did not lessen her obligation, as a following vessel, to use all reasonable diligence to keep out of the way of the vessel overtaken, and fault on the part of the schooner did not relieve her from the obligation of proving that she was not in fault, or that the case was one of unavoidable accident; that this burden she had not sustained, if the schooner was seen as far distant as was alleged, because her porting was, in that case, error, since a starboarding of her wheel would easily have carried her under the schooner's stern; nor was the error one *in extremis*, considering the distance between the two vessels, and the moderate speed at which the steamer was gaining upon the schooner. Moreover, on the whole evidence, it was most probable that the real error of the steamer was neglect in the lookout in not seeing the schooner until the vessels were much nearer than they admitted, and so near to each other that there was no time to avoid the schooner, and that there was negligence in not observing her in time. The damages were therefore divided.

In Admiralty.

*Owen & Gray*, for libelant.

*A. O. Salter* and *R. D. Benedict*, for claimants.

BROWN, J. This libel was filed by the owners of the schooner Mary J. Russell, to recover the sum of $21,600, their alleged damages through the loss of the schooner and her cargo, arising out of a collision with the steam-ship City of Merida, at about 1 o'clock A. M.

---

[1] Reported by R. D. & Edward G. Benedict, Esqs., of the New York bar.

on the morning of April 11, 1883, about 60 miles north-east of Cape Hatteras. Both vessels were going in nearly the same direction; the schooner, with a cargo of lumber, being bound from Jacksonville, Florida, to Leesburg, New Jersey; and the City of Merida being bound on one of her regular trips to New York. The night was overcast and dark, but without fog; the wind strong from the north-west. The schooner was sailing by the wind on her port tack, varying from N. N. E. to N. E. by N., and making about 4 knots per hour. The steamer was about 250 feet long, having a general cargo, and 60 passengers. She was making about 10 knots per hour, on a course N. by E., and was coming up on the starboard side of the schooner. Her lights were first seen from the schooner about a point off the latter's starboard quarter. The schooner was not seen on the steamer until within a few lengths of her, when the steamer's wheel was ported, and signals were given to stop her engines; but neither were in time to avoid the collision. The stem of the steamer struck the schooner near her mizzen-chains on her starboard side, and raked her thence forward, carrying away her mizzen-rigging, main-rigging, and fore-rigging, and got tangled in her head-gear, from which she was at length cut away. The schooner was so damaged that she was abandoned not long afterwards; and, with her cargo, was totally lost. The stem of the steamer was knocked away to starboard, and a hole stove in below the water-line, so that she leaked badly, and was obliged to put in towards Norfolk, where she was beached in order to keep her from sinking in deep water.

On the part of the steamer it is claimed that the collision was wholly the fault of the schooner, in not exhibiting a flash-light to the steamer as the latter came up astern. For the schooner, it is insisted that no flash-light was required, for the reason that when the steamer was first seen, several minutes before the collision, and thenceforward, up to perhaps half a minute before the collision, the steamer's green light, and not her red light, was visible, indicating that she was passing across the schooner's stern; and also because, when the steamer's red light first became visible, there was not time to get and exhibit a torch-light; and further, because, if a torch-light had been exhibited at that time, it would have been of no use, since the schooner was then in clear view of the steamer.

The testimony upon these points is irreconcilable. There is no doubt that the steamer's lights were visible a mile distant. The look-out of the schooner estimated her distance at a mile when he first saw and reported her lights. He testifies that he then saw her mast-head light and her green light only about a point off her starboard quarter; that he reported these to the master, who was on deck; and the master testified that he saw them on the same bearing, and considered himself in no danger, as the green light showed that the vessel was going astern of him. If the steamer was a mile distant when her lights were first seen, as her speed was only six knots in excess of the speed

of the schooner, these lights must have been seen 10 minutes before the collision. The first officer, who was in charge of the steamer, testifies that her course was N. by E., or, possibly, a little further to the eastward; and that no change of her helm was made until the sails of the schooner were seen, about two or three lengths of the steamer ahead; and that the schooner was then from a quarter to half a point upon his port bow. The lookout says that she was a point on his port bow.

If during this interval of some nine minutes the steamer was a point on the schooner's starboard quarter, and making a course N. by E., her green light could not have been visible at all; but her red light and mast-head light only would have been seen; while the schooner, when she first came in view, if the steamer's green light only had been in view, must have been upon the steamer's starboard bow, instead of on her port bow. Again, had the steamer, some ten minutes before the collision, being from one to two points off the schooner's starboard quarter, been upon a course which would exhibit her green light, and not her red light, her green light would have been constantly hauling astern of the schooner, and, in a little more than half the time that elapsed before the collision, her green light would have borne off the port quarter of the schooner; whereas the testimony of the captain is that her green light continued bearing in about the same direction, namely, one point off his starboard quarter, up to the time when the change of lights was seen, which was only about a minute or a minute and a half before the collision.

Various hypotheses have been suggested concerning the previous navigation of the vessels, so as to account for their coming into collision in the way that they certainly struck. One controlling fact in the case, about which there can be no dispute, is that the blow of collision was struck, not by the side or bow merely of the steamer, but by her stem. Her stem was knocked to starboard by the shock. The difference in the courses of the two vessels at the moment of collision, therefore, could not have been less than *two* points. But the difference in the previous general courses of the vessels, as testified to, even without the change made by the steamer's porting in consequence of the approaching collision, was but *one* point,—the schooner's course being N. N. E., and the steamer's N. by E.; and even supposing that the schooner was at that time falling off to the furthest limit of her variation, namely, one point, so as to be going N. E. by N., there would still be but two points of difference, with no room for any such change as alleged, under the steamer's port wheel.

On the part of the steamer the first officer testifies that, when the schooner was first seen, his wheel was put hard a-port, and that the steamer swung somewhat to starboard. But his testimony is very indefinite in this respect, as he did not look at the compass; and he is unwilling to testify that she swung as much as two points. She swung some, he says; but, as he thinks, less than two points. But

if she swung any to starboard, her stem certainly could not have struck the schooner, unless the schooner had fallen off more than a point, or else unless the steamer's previous course had been more to the northward than N. by E. If the latter was the fact, then she was going negligently out of her intended course. If at any time during the 10 minutes preceding the collision she headed three-fourths of a point to the northward of her proper course, a diagram of the general courses of the vessels will show that both colored lights would have been exhibited to the schooner; a little further heading to the northward would have shut in the red and exhibited the green light only. But the hypothesis that the steamer was heading so much to the northward of her course during some nine minutes, presupposes a very improbable degree, and a long continuance, of negligence in the wheelsman. He was not examined, for reasons which, perhaps, are satisfactory. That hypothesis is, moreover, inconsistent with the fact that the colored light seen by the schooner did not draw astern of the schooner, as it would have done if such a northerly course had been continued by the steamer for any length of time; and the contention of the schooner is that the green light only was exhibited until a minute or so before the collision.

There is no hypothesis concerning the previous navigation of the two vessels that has been suggested, or that I have been able to imagine, that will account for this collision, without contradicting the most material portions of the testimony on one side or on both sides. From what has been said, it is apparent that there are very strong improbabilities in the story told by each. The simplest and most natural explanation would be to suppose that the lights of the steamer were not seen at all, until just before the time when the red light was noticed,—that is, when she was some 700 or 800 feet distant, about a point or two off the starboard quarter; that at that time the two lights were actually visible, but only the green light at first noticed, the red being possibly obscured to the view of the lookout at the moment. This supposition, doubtless, does great violence to parts of the schooner's testimony. It is unnecessary, however, to make definite findings in these respects. there being sufficient in the story of each as it stands, combined with the circumstances of the case, to show that each is in fault.

1. Assuming that the captain of the schooner saw the steamer's green light when the lookout first reported her, namely, about a mile distant, and that, as he says, this light continued bearing about a point on his starboard quarter until the hull of the steamer came in view, and that she then ported, so as to bring her red light in view for the first time, the fact that the light during this long interval did not haul astern should have been clear proof to him that the steamer was following him up, instead of crossing the schooner's stern, and that he ought to show a flash-light, or give some signal of warning, before she had come so near. If the light seen had been the red

light, instead of the green light, and both vessels kept upon their proper courses, the red light would have continued to be seen by the captain of the schooner on the same bearing, or nearly the same bearing, during the whole interval; changing only with the changes of the schooner in following the wind.

The master must have known that the green light could not possibly remain on the same bearing unless the steamer were constantly going to starboard under a port wheel; and this was sufficient notice to require him to exhibit some signal to a vessel so nearly astern. Such a change on the part of a steamer at sea, continued during nearly 10 minutes, would, indeed, be very remarkable. I do not credit it; but if actually observed, as the captain and the lookout seem to testify, they could not fail to know its meaning; and ordinary prudence, if not the letter of the statute, would have required them, under such circumstances, to show a timely signal of warning to a vessel coming up astern in this peculiar manner. *The Oder*, 13 FED. REP. 272, 283; *Leonard* v. *Whitwill*, 10 Ben. 638. It is more probable, however, that the steamer's lights were not seen at all until very much nearer the time of collision than is estimated by the schooner's witnesses; and that if the steamer's lights had been seasonably noticed, the red light would have been seen first. It is improbable in the highest degree that the steamer was for any length of time heading so much off from her proper course of N. by E. as to obscure her red light. The captain of the steamer testifies that his lights were visible that night two miles. I have no doubt that had a reasonable lookout been kept for vessels coming up astern, the steamer's red light, and that only, except her mast-head light, would have been seen from 10 to 15 minutes, at least, before the collision. Seeing the red light, and seeing it continue, as it undoubtedly did continue, on about the same bearing, and only a point or two off his starboard quarter, the captain of the schooner would have known that a torch-light should be exhibited; and if it had been exhibited, that would, without doubt, have averted the collision. The schooner must therefore be held in fault.

2. Notwithstanding the fact that no light or other signal was exhibited to her, the City of Merida must also be held in fault, either for bad and inexcusable navigation in porting when the schooner was seen far enough off to be easily avoided by starboarding, or else for negligence in not seeing the schooner in time to have passed easily astern of her.

The act of 1871, now section 4234 of the Revised Statutes, requiring the exhibition of a lighted torch, was designed to furnish additional safeguards against collision; not to dispense with any of the previous obligations of diligence on the part of an overtaking vessel to avoid one ahead of her. In such cases it was previously the well-established rule, and it is the rule still, that a vessel astern must keep out of the way of a vessel ahead; and upon failure to do so, the vessel astern is presumptively in fault, whether she be a steamer or a sail-

ing vessel. *Whittridge* v. *Dill*, 23 How. 448; *The Grace Girdler*, 7 Wall. 196, 202; *The Governor*, Abb. Adm. 108; *Simpson* v. *Spreckels*, 13 Fed. Rep. 93.

The omission of obligatory signals by the leading vessel does, indeed, charge her with fault; but it does not relieve the following vessel from the burden of proving that she kept a proper lookout, and that proper and timely efforts on her part to avoid the vessel ahead were thwarted by the latter, or that the weather was such that the vessel ahead could not be seen in time to avoid her; and that the accident was therefore unavoidable. *The Grace Girdler, supra; The Morning Light*, 2 Wall. 550.

In the case of *The Grace Girdler*, though the weather was clear, a majority of the court held the collision to have been the result of unavoidable accident, *i. e.*, not avoidable by reasonable or ordinary care and skill, under the complications of the navigation of three boats. In the case of *The Morning Light*, the vessel astern was acquitted on the same ground of unavoidable accident, in consequence of the great darkness, and of thick fog. In the present case, although the night was dark, there was no fog. Vessels ahead, even without lights, could be seen at some considerable distance. This plainly is not a case of unavoidable accident. As respects faults in the steamer, where there is prior fault on the part of the sailing vessel, the considerations so forcibly stated by WOODRUFF, J., in the case of *The Ariadne*, 7 Blatchf. 211, are not to be overlooked; that "vessels have a right to assume that other vessels in their neighborhood are acting in obedience to statute regulations; and when the negligence of the sailing vessel, and her failure to comply with the statutes requiring her to bear a light which can be seen at a distance of two miles, have led the steamer into danger of collision, it is not for the sailing vessel to insist that by *more than usual negligence she might have been discovered at a few yards greater distance, and to claim contribution on that ground.*" Page 213.

Giving the steamer in this case the full benefit of this rule, the question here is whether the City of Merida does show "usual vigilance" on her part; and whether the facts warrant the inference that she did use reasonable and ordinary care and diligence, both in seeing the schooner when she first came in view, and in trying to avoid her afterwards. On these points, in my judgment, the steamer has not acquitted herself of blame. The evidence necessitates the inference either of negligence in the lookout, or of unskillful and bad navigation.

The testimony of the lookout is that he saw and reported the schooner when she was two or three lengths distant, *i. e.*, from 500 to 750 feet, and about a point on his port bow. The first mate, who heard and answered the lookout's report, says that he saw the schooner at that time, and that she was then between one-quarter and one-half of a point—not outside of one-half point—on his port-bow. He then knew the schooner was upon her port tack; and when he first saw her,

he saw the edge of her sails plainly. He does not give any estimate of her distance, but he estimates the time at half a minute before the collision. The engines, he says, were at once ordered to be stopped; but the speed of the steamer was not essentially checked. If the time was but half a minute, the steamer would have gone some 500 feet in the interval, and the schooner 200 feet; so that the distance between them would have been but 300 feet when the mate first saw her. If the interval was a minute, their distance apart would have been 600 feet, which is not far from the lookout's estimate of two or three lengths; that is, from 500 to 750 feet. Various witnesses on the part of the libelant, whose estimates were rightly received, *ex necessitate*, judged that a vessel's hull or sails could be seen, as the weather was that night, a quarter of a mile or upwards. The master of the steamer says that after the collision he could see the schooner some 400 or 500 feet off,—the distance from the schooner at which he lay to.

From the testimony I cannot doubt that the schooner was easily discernible some 600 feet distant, and ought to have been seen and reported by the lookout at that distance. The position of the first officer near the wheel-house makes his estimate of the schooner's bearing more likely to be correct than the estimate of the lookout; and the first officer's estimate is from a quarter to a half a point only on his port bow. He testifies that the City of Merida answered her wheel readily, and in going 600 feet with her wheel hard a-starboard, the City of Merida, not a large steamer, would certainly have changed two points, and she would thereby have gone astern of the schooner, even had the latter remained stationary. But as the schooner was all the time going to starboard, though nearly in line with the steamer, and as the mate of the steamer knew this fact, it would have been from the first obvious to him that there was abundant room to pass astern, under a starboard wheel, had the schooner been seen at the distance of 600 feet. In fact, as the steamer would have had 1,000 feet to pass over before the collision, had she changed under a starboard wheel no more rapidly than much larger steamers change, (*The Lepanto,* 21 Fed. Rep. 651, 654,) she would have gone, upon starboarding, several hundred feet astern of the schooner, as a drawing of the courses will clearly show.

In behalf of the steamer it is urged that, though her porting may have been an error, it was an error of judgment only, *in extremis,* when brought into a dangerous situation by the fault of the other vessel. *The Elizabeth Jones,* 112 U. S. 514; S. C. 5 Sup. Ct. Rep. 468. But at a distance of 600 feet astern, with the schooner not exceeding half a point on the steamer's port bow, and with the course of the schooner known, and with so moderate a difference of speed, I cannot possibly regard the situation of the steamer as *in extremis.* The bearing of the schooner, only a quarter or half a point on the port bow of the steamer, and going in nearly the same direction, was very favorable

for easily avoiding her at that distance, or even at a considerable less distance. The means of doing so by starboarding were so obvious, that porting at the distance of some 600 feet, in that situation, was inexcusable.

Various circumstances, however, satisfy me that the error of the City of Merida was not of that kind, but in neglect to observe the schooner until she was very much less than 600 feet distant, probably less even than 300 feet; and that her very close proximity was the reason why, in the language of the mate, he judged that "porting was his only salvation."

The evidence is that he gave the order to port instantly, and went into the wheel-house to assist in putting the wheel hard over as soon as possible. At the same time he gave orders to stop the engine. He also says that when the engine was stopped, the vessels were very close to each other; showing that the time must have been very short between the order to port and the collision. It is noticeable, also, that he would give no estimate of the amount that the steamer swung under her port wheel, saying only that it was less than two points; while the considerations that I have pointed out above indicate that if the steamer was upon a course of N. by E. previously, as the mate also testifies, she could not have swung much, if any, to starboard, and have had her stem strike the schooner as it did. It would take a short time—perhaps one-quarter or one-third of a minute—to get the wheel over so that the steamer would begin to feel its effect perceptibly; while, after that, she would swing rapidly to starboard, at the rate undoubtedly of a point in every 300 feet. If her previous course was N. by E., as her witnesses say, or even N. $\frac{1}{2}$ E., a half a point more to the northward, still, it is certain that she could not have swung even a point under her port wheel. Taking all these circumstances together, and the unsatisfactory and insufficient narrative of the steamer's witnesses, I am satisfied that the schooner was not noticed at all until the steamer was close upon her; and that there was negligence in not observing her in time to have avoided her easily, and without alarm, by starboarding. But if the other alternative be adopted, that the schooner was seen and reported at a distance of, say, 500 or 600 feet, and only one-quarter to one-half of a point on her port bow, then there was abundant time to have gone astern of her, by the exercise of ordinary nautical judgment and skill. The fact that the two vessels were pursuing almost the same course, and with but a moderate difference of speed, makes this case wholly different from the cases of meeting or crossing vessels, as in the cases of *The Ariadne,* 2 Ben. 472; S. C. 7 Blatchf. 211; *The Narragansett,* 3 Fed. Rep. 251; S. C. 11 Fed. Rep. 918; *The Algiers,* 21 Fed. Rep. 345,— to which my attention has been called, and in which the court found there was no lack of vigilance in the steamer.

On either alternative the steamer must be held in fault, and the damages must therefore be divided.