## THE CITY OF MACON.

### BEDOUIN STEAM NAV. CO., Limited, *v.* THE CITY OF MACON.

*(District Court, S. D. Georgia, E. D.   October 17, 1891.)*

1. COLLISION BETWEEN STEAMERS—PASSING IN RIVER—SUDDEN SHEER.
   The steamer Nedjed, drawing 19 feet of water, in charge of a tug, and also using her own engines, was passing down the Savannah river on the south side, opposite Fig island light, followed by the steamer Macon. The channel at that place is nearly straight, and about 400 feet wide, and large vessels frequently pass each other there. The Macon signaled that she desired to pass on the north side. Whether the Nedjed assented or warned her not to pass is uncertain. As the Macon was about to pass, the Nedjed sheered to port, and ran across her course. The Macon backed, and soon after the vessels collided, the Nedjed almost immediately afterwards grounding on the north shore mud flats. *Held,* that the Nedjed alone was in fault, as it was her duty, under Rev. St. U. S. § 4233, regulating the passage of vessels running in the same direction, to keep in her course.

2. SAME—EXCUSE FOR SHEERING—IMPROPER LOADING.
   The fact that the Nedjed was improperly loaded, had a list to starboard, and did not steer well, did not exonerate her, as that was her own fault or misfortune, and was not known to master of the Macon. If she could not be steered, she should have been stopped.

3. SAME—COLLISION IN BACKING.
   Although it was an error for the Macon after the collision to lie so near astern as to be in any danger of being struck by the Nedjed when she backed off from the mud flat, yet the error did not amount to a fault in regard to such second collision, in view of the confusion incident to the former collision, and the fact that the Nedjed was unlawfully in the Macon's course.

4. SAME—WARNING NOT TO PASS.
   When two steamers are proceeding in the same direction, and there is room for the one astern to pass, she is not bound to heed a signal not to do so, when no danger is apparent.

5. SAME—EXCESSIVE SPEED—MUNICIPAL REGULATION.
   The fact that a steamer, attempting to pass another going in the same direction down the Savannah river, was going faster than allowed by the ordinances of Savannah, does not affect her liability for the consequences of a collision, when such speed did not in any way cause the collision.

*Charlton & Mackall* and *W. R. Leaken*, for libelant.
*Lawton & Cunningham*, for respondent.

SPEER, J.   The Bedouin Steam Navigation Company, an English corporation, has brought the libel in this cause against the City of Macon, a steamer claimed by the New England & Savannah Steam-Ship Company, a Massachusetts corporation, and the owner of a line of steamers plying coastwise between Boston and Savannah.   The libel is brought to recover for the damage resulting to the Nedjed, a steamer owned by the libelant, from a collision, on the morning of the 18th of October, 1890, in the Savannah river, with the City of Macon, claimed by the respondent.   Both steamers were outward bound.   The libel alleges that the Nedjed, loaded with bales of cotton, left her wharf in the city of Savannah at 9:10 A. M.   She was drawing 19 feet 6 inches.   She was in charged of a licensed pilot, and had the assistance of a tug ahead towing her.   She was about to enter a narrow and difficult passage in the river, and was steering a proper course.   At that point, the libel alleges, the river sweeps to the eastern shore, and between that point and the

entrance of the narrow passage above mentioned, known as the "New Cut," it sweeps to the other side about a point and a half. This, it is said, makes such a winding course that in order to keep the channel the steamer must use her starboard and port wheel successively. On one side of the river the wharves and shipping, and on the other side the shallows and shoals, make the channel hazardous for large vessels attempting to pass each other. This point is opposite the wharves of the Savannah, Florida & Western Railway Company, on the Savannah or south side, and about the Fig island light on the north or east side. The libel further alleges that the City of Macon, having been a long way astern, overtook the Nedjed, apparently at a high rate of speed, and, although she might with proper precaution have commanded her movement, nevertheless signaled the Nedjed with two short blasts of the whistle that she would pass the Nedjed to the port. Perceiving that this made a collision imminent, the latter gave repeated signals and warnings to the pursuing vessel to keep astern. Notwithstanding all these signals, the libel charges that the Macon came forward under full headway, and, when the Nedjed was abreast of the beacon on Fig island, at about the narrowest part of the passage, and when the attempt to pass was in no event safe, the Macon, contrary to the rules of navigation, without stopping or slackening her speed, or reversing the engine, came on rapidly, and getting about one-third her length overlapping the Nedjed's port, where, her position being such, by reason of the condition of the tide and currents and other causes, as to tend to draw both said steam-ships together, she, the said Macon, then suddenly reversed her engines to go astern, but, still under her heavy momentum, canted her head onto the Nedjed's port, near the midships, her fore-foot striking two or three feet above the port bilge, and the bluff of her bow on the bulwarks and main-rails, of the Nedjed, and scraping with force, the Macon's pressure and momentum turning said Nedjed's stern to starboard, and threw her across the river, and caused her bow to strike bottom on the north shore; and thereupon, realizing her peril, and observing that the said Macon had backed clear of her some distance astern, with her engines apparently stopped, she, the Nedjed, reversed her engines, and stopped her headway sufficiently to keep her from going further aground, and at once, when afloat, stopped her engines, and with the tug's assistance straightened out in the stream; that, as the Nedjed was just about straightened in the channel, with no headway at all, the said City of Macon, being then about 50 feet astern, again started her engines ahead, and, coming on, struck the Nedjed on the starboard side of her stern, and that after the second collision said City of Macon backed and kept astern until said Nedjed had anchored at Venus point. These are the averments upon which libelant bases its prayer for a judgment of indemnity for damage in a large amount.

The answer of the respondent denies that the Nedjed was, at any time after leaving the wharf, and until the collision had occurred, in a narrow or difficult passage in the channel. All that portion of the channel described in the libel as narrow and dangerous for passing ves-

sels is well known, it alleges, to be a part of the river where vessels constantly pass without difficulty. There is no sharp curve in the channel which will require a steamer to change her course. The deepest water is on the south or Savannah side of the river. The shallows are on the north side, but there is ample width of channel for passing vessels at the point where the collision was had. The answer further affirms that, preceding the collision, the master of the steam-ship City of Macon indicated by two blasts of her steam-whistle (the usual signal) that he purposed to pass the Nedjed on her port side. At this time the Nedjed was on the south side of the river, near the shipping lying at the wharves of the Savannah, Florida & Western Railway Company. To this signal the Nedjed acquiesced, giving two short blasts of her whistle. The respondent denies that the Macon was pursuing the Nedjed at a high speed, but insists that she was proceeding at the proper speed usual in the navigation of the Savannah river. Respondent also denies that the officers of the Nedjed warned the Macon to keep astern. It also denies that there was any bend in the river, or in the channel through which the Nedjed was about to go at the time the collision took place. To account for the collision, the respondent insists that, as the Macon was approaching and about to pass the Nedjed, which it was competent and permissible to do under the existing circumstances, the Nedjed changed her course, and sheered across the channel, and across the course of the Macon, thus putting herself at almost a right angle to the course of the tug which had her in tow, and forcing the City of Macon off of her course, and causing the collision which took place. It was then flood-tide, and the depth of the channel was 6 feet and 6 inches above the mean low-tide. The channel measurements at mean low-tide opposite Fig island show that there was a depth of 20 feet and 6 inches, and a channel width of more than 400 feet at that point. The answer further states that the officers of the Macon had no intimation of any sort that the Nedjed was about to change her course, and sheer across the channel, and across the bows of their steamer. When the Nedjed began to sheer, she was within about 300 feet of the bow of the City of Macon. The engine of the latter vessel was stopped, and, when it appeared that the Nedjed was continuing to sheer, the Macon was put full speed astern, and, as soon as the headway of the Macon was overcome, she began to back. She had about stopped when the collision took place. The Macon continued to back until she was clear of the Nedjed, which from the time she began to sheer, was heading diagonally across the channel to its north side. At the time the Macon indicated her intention to pass the Nedjed on her port, the latter was on the south side of the channel, on the usual course of ships navigating at that point. The officers of the Macon had the right to presume the Nedjed would continue on her course, and, had she done so, there could have been no collision; but, after she began to sheer, no effort was made to keep her on her proper course, or to prevent her crowding on the course of the Macon, and running across her bow. At the time the engines of the Macon were stopped. The wheel of the Macon was put to starboard. The

Nedjed at the time, for some cause unknown to the respondent, was apparently not minding her wheel.

As to the second collision, the respondent alleges that when the first collision had occurred, and the City of Macon had gone astern, and was lying in the river with her engines entirely stopped, the Nedjed backed into her, although the City of Macon put her engines full speed astern, and endeavored to avoid a collision. For the reasons stated in the answer, the respondent insists that both collisions were wholly due to the negligence with which the Nedjed was managed, and that the libel should be dismissed.

The evidence in the cause, as usual in cases resulting from collisions, is conflicting. The testimony of many of the more important witnesses, however, closely examined, was given in the presence of the court, and several witnesses to the material facts in dispute were disinterested, and not connected with either vessel. Upon consideration of all the evidence, the court finds that it was neither dangerous nor improper for the respondent steamer, the City of Macon, to attempt to pass the Nedjed at that portion of the channel where the effort was made. The place is well known. It is opposite the immense wharves of the Savannah, Florida & Western Railway Company. The channel itself, as the government charts in evidence indicate, was 400 to 450 feet in width. It was common for large vessels to pass at this point. A very intelligent witness was Henry D. Foster, captain of the steam-ship Berkshire, in no way connected with the interests of the respondent. He testified that he was familiar with the channel; that it was pretty nearly straight. "We," he said, "always use that place to pass. A vessel drawing eighteen to nineteen feet can go within sixty feet of the north shore an hour or an hour and a half before flood. Deep water is on the south side of channel, next to shipping." This witness had been navigating the river about 6 years, and is a licensed pilot, and he testified that he followed other captains piloting on the river for 25 or 30 years. He testified that there was very little curve in the channel. It appeared otherwise in the evidence that the tide was about two-thirds flood. This was also substantially the evidence of Martin S. Fredericks, the captain of the tug Cambria, who had been on the river for 23 or 24 years, and who was towing the Nedjed. He had seen large ships pass there, both meeting, and going in the same direction. There was no difficulty about it. Capt. Daniels said that it was a pretty fair channel. This witness was a Savannah river pilot. W. H. Rogers, captain of a tug-boat, testified that vessels pass anywhere between Bilbo canal and Fig island light. It is about the widest part of the river, and the channel is straight. Van B. Avery, a captain of tug-boats, said he was thoroughly familiar with the channel; had been connected with tow-boats for seven years. He had seen large ships pass at that point. It is the best place to pass. All of these witnesses are apparently disinterested. It is also true that Lewis, the captain, and Foster, the first officer, of the Macon, and Daggett, the captain of the Chattahoochee, all in the employ of the respondent, testify to the same facts. It is true that a number of wit-

nesses who were called for the plaintiff testified that the channel was narrow and difficult. Fleetwood, the pilot in charge of the Nedjed, is perhaps the most emphatic of these; but he admitted that a ship of deep draught can keep a straight course from Lamar's canal to the jetty; this embraces the distance in controversy, and the collision occurred above the jetty. Isaac Henry, another pilot, testified that the channel was much too narrow for the steamers to pass, but also said that the Macon had plenty of room to pass on the south side of the Nedjed. This contradiction in his testimony does not appear to be explained. W. T. Daniel, for the libelant, testified that ships may pass with great precaution. It is insisted for the libelant that the Savannah river pilots, who testify with considerable unanimity that the channel is dangerous, are entitled to more credence than the tug-boat captains and steam-ship masters, who are also pilots. It is enough to say on this subject that, while it is the policy of the steamers belonging to the respondent and to the New York and Baltimore lines, to dispense with the services of the skillful body of local pilots who are familiar with the waters of the Savannah, yet each vessel has in its master a Savannah river pilot, licensed as such by the laws of the United States. These officers are presumed to know their duty, nor would it be possible for the companies to conduct the immense business of water transportation in which they are engaged if these men were incompetent or unskillful. Besides, their testimony is confirmed by the government charts, and, as we have seen, by many witnesses, apparently without interest. Fleetwood, the pilot of the Nedjed, estimates the channel to be more narrow by 100 to 150 feet than the charts indicate. We conclude, therefore, from all the evidence, that there was nothing in the channel of the river there, in the existing condition of the tide, which made it dangerous or improper for the Macon to attempt, as it did, to pass the Nedjed.

It is further insisted by the libelant that the Nedjed by three blasts of the whistle declined to acquiesce in the purpose of the Macon's master to pass to port, and that it was negligent in the pursuing vessel to proceed on that course. It is however, by no means clear from the evidence that the Nedjed gave the signal of non-acquiescence. It is not disputed that the Macon gave the proper signal for her course down the north side of the channel, nor that the usual and proper course of the Nedjed was on the south or starboard side, but it is seriously in doubt whether the Nedjed blew two or three whistles in response to the signal of the Macon. The court is inclined to the belief that three whistles were blown by the Nedjed; the two first at such an interval that the master of the Macon might well conclude that his signal was acknowledged and assented to, and the third at such later interval as would justify him in disregarding it as without significance and as unimportant. The testimony of Fredericks, the master of the tug towing the Nedjed, will warrant this opinion. Be this as it may, there is nothing apparent which would inhibit Capt. Lewis from proceeding on his proper course. The Nedjed, from all the testimony, was on the south side of the channel. She was under her own steam, and had the assistance of a tug.

There was as we have seen, a favorable opportunity for the Macon to pass; and if it appeared to the master of the Macon that the Nedjed, properly navigated, could not get in his way, there is no rule which makes it his duty to go astern of a slower vessel because perchance the officers of the latter might prefer it. At this time the Nedjed was straight in the channel. The tug was pulling her over to the south side. Her course was straight down the river in the wake of the tug, and Capt. Lewis of the Macon had the right to presume that she would stay there. The only possible danger of collision which he could foresee would have resulted from suction, and it being the duty of the masters of both vessels to provide against this danger, it was plainly incumbent on the Nedjed to keep to starboard as far as possible. Rule 8 of the statutory law for the navigation of steam-vessels (section 4233 of the Revised Statutes) provides:

"When steamers are running in the same direction, and the pilot of the steamer which is astern shall desire to pass on the right or starboard hand of the steamer ahead, he shall give one short blast of the steam-whistle as a signal of such desire and intention, and shall put his helm to port; and the pilot of the steamer ahead shall answer by the same signal, or, if he prefer to keep on his course, he shall give two short and distinct blasts of the steam-whistle, and the boat asking to pass must govern herself accordingly; but the boat ahead shall in no case attempt to cross her bow, or crowd upon her course."

It is true that every vessel overtaking another vessel shall keep out of the way of the last-mentioned vessel; and wherever, as provided in the rules, one of the two vessels shall keep out of the way, the other shall keep her course, subject to the qualifications of rule 24, which gives a latitude arising from dangers of navigation or special circumstances rendering a departure from them necessary in order to avoid imminent danger. These rules have been applied in several cases by the supreme court of the United States in such manner as will afford great assistance in the ascertainment of the rights of the parties now before the court.

In the case of *The Grace Girdler*, 7 Wall. 196, the injured yacht was held to be blameless, save in that she suddenly sheered herself before the schooner, and took her by surprise. Page 201. "It is not intended," said the court, (page 202,) "to impugn anything said by this court in *Whitridge* v. *Dill*, 23 How. 448, as to the rules which should govern a vessel behind another, and pursuing the same course. This case is plainly distinguished from it in several particulars. It is sufficient to mention one of them. In that case there was no sudden change by the leading vessel to a course across the bows of the one behind her. That is the controlling fact in the case under consideration." It was held that the leading vessel, unexpectedly crossing the bow of the pursuing vessel, could not recover for injuries flowing from the collision which resulted.

In *Whitridge* v. *Dill*, 23 How. 448, to which the court refers above as expressing the rule as to the duty of the pursuing vessel, Mr. Justice CLIFFORD, for the court, quotes with apparent approval the language of Judge BETTS in *The Governor*, Abb. Adm. 110, a case where steamers

were involved. The fact that they were running in the same direction, the one astern of the other, imposed upon the rear boat an obligation to exercise precaution and care, which was not chargeable to the same extent upon the other. He accordingly held that a vessel in advance is not bound to give way, or to give facilities to a vessel in her rear to enable such vessel to pass; but that the vessel ahead is bound to refrain from any manœuvres calculated to embarrass the latter vessel while attempting to accomplish that object. Similar views had previously been announced by the same learned judge in the case of *The Rhode Island*, decided in 1848. That case was appealed to the circuit court, where it was affirmed. *The Rhode Island*, 1 Blatchf. 363. In *The Corsica*, 9 Wall. 630, that vessel being to the starboard, it was held that the America was bound to keep out of her way, but the Corsica had the corresponding and reciprocal duty to keep on her course. "It can hardly be doubted from the evidence, taken together," said Mr. Justice BRADLEY, "that, had the Corsica kept on her course, the collision would not have occurred; but, instead of doing this, the persons in charge of the Corsica, just before the collision occurred, ordered her helm hard a-starboard, and thus turned her right upon the America, which, as in duty bound, was backing out of her way." It was held that, in the absence of a satisfactory and controlling reason for the change of course, the Corsica could not recover. See, also, *The Cherokee*, 15 Fed. Rep. 119–122.

In the case under consideration, the reasons offered for the erratic course of the Nedjed, which led her suddenly to leave the south side of the river, and sheer entirely across, not only the channel, but the 700 feet of river itself, crossing the course of the Macon, and going aground on the northern shore, was that she did not steer well, even with the assistance of the tug, as she was improperly loaded, had a list to starboard, and took the bottom. All of this proceeds from her own misfortune, or the negligence or want of judgment of her people. It does not appear that any of these conditions were or could have been known to Capt. Lewis, in charge of the Macon. He had the right to presume that the Nedjed would obey her helm, be intelligently guided, and keep on the south side of the channel,—her best, most direct, and her lawful course. He could not anticipate that she would sheer suddenly across his bow in such manner as to crowd his vessel on the north shore, and make a collision inevitable; and yet such is the inevitable conclusion from the evidence. It is equally evident that there would have been no collision but for the extraordinary and unexpected movement of the Nedjed; and it cannot, we think, be properly maintained that the Macon is liable for injury resulting to the Nedjed from her own misfortune or her own fault. In the case of *The Minnie R. Childs*, 9 Ben. 200, the court observes:

"It was suggested in the argument that the Childs in such shallow, muddy water would not steer well, and that this is the reason for the failure to get over to east. If such be the fact, it does not avail to relieve the Childs from responsibility for damage caused thereby. If she could not be steered, she should have been stopped."

It would seem indeed, that those in control of her must have known that the Nedjed with her bad loading, would be practicably unmanageable, in that condition of the tide. They must have known too, the hazard which would possibly result to other shipping in the river and harbor. Besides, the sailing hours of the respondent's vessel are well known, and it is scarcely competent, we think, for the Nedjed to insist that she was entitled to the entire channel, and thus to practically bar the Macon from proceeding to sea. Be this as it may, we feel obliged to find that the first collision was exclusively due to the unmanageable condition of the Nedjed, which made her sheer across the course of the Macon. It is moreover true that the Nedjed went ahead at full speed in her sheer to the north shore until she went aground, whereas, had she reversed her engines, with the aid of her tug pulling almost at right angles toward the south shore, the Macon reversing also, there would have been no collision. This, however, may have been an error, and not a fault. The paramount and controlling fact is that the proper course of the Nedjed was along the south shore of the river, whereas we find her, almost simultaneously with the collision, aground on the north shore, and in the path of the Macon.

The argument of proctors for the libelant, that the Macon came down the river until near the Nedjed at a greater speed than the ordinances of Savannah permit, does not appear material. The speed of the Macon had nothing to do with the collision. She had stopped her engines, and was going astern, at the time of contact. It is moreover true that the Macon was not proceeding "along the line of wharves," but was on the opposite side of the river, and the "unnecessary suction," from which it is the object of the city ordinances to protect the shipping moored to the wharves, could not have resulted; nor did suction play a part in causing the collision. Where the collision does not result therefrom, a fault or error on the part of the libeled vessel is not material. *The Duke of Buccleugh*, (Ct. App.) 15 Prov. Div. 86; *Navigation Co. v. The Emma Kate Ross*, 41 Fed. Rep. 826; *The Iberia*, 40 Fed. Rep. 893.

In the case of *The E. A. Packer*, 140 U. S. 360–370, 11 Sup. Ct. Rep. 794, Mr. Justice BROWN observed: "If it were clear that no collision would have occurred had the Wolverton kept her course, then the starboarding of the Packer was not a fault," etc. That case is otherwise valuable for the light it affords to the disputed matters in the case under consideration.

With reference to the second collision, the evidence is likewise contradictory. We find, however, certain significant facts in the testimony of libelant's officers, all of which point to the conclusion that the Nedjed went full speed astern against the Macon, and that the Macon did not steam ahead against the stern of the Nedjed. The tide was two-thirds flood, and, the Macon having reversed her engines, its influence operated to carry her up stream. Her officers all testify that she was lying in the stream. The Nedjed had run into the mud, as the piling she knocked over still indicates. The tug was off her starboard bow. Her captain (Newey) testifies that he ordered the tug to pull to starboard, but did not start

his engines astern to get her afloat. The Nedjed, deeply laden, having gone ashore under the speed bell, it is highly probable that the tug pulling on her starboard bow could not have released the steamer from the deep bed she must have made in the muddy shallows of the northern shore. The obvious order of the Nedjed's master was to go astern at full speed. Her engines, with the assistance of the current, would then readily carry her back over the same path she had already forged through the mud. Her chief engineer testifies that the order given him was "full speed astern." John Broady, one of the officers, testifies to the same fact. The memorandum book which it was the duty of this witness to keep shows the entry "9:22 A. M., full astern." Ellis, captain of the British steamer Capulet, testified that, while it seemed to him from the opposite side of the river that the Macon ran into the Nedjed, it might have been that the Nedjed backed into the Macon.

In view therefore, of all the evidence, and the obvious probabilities of the exigency then existing, we find that the Nedjed went astern against the Macon, thus causing the second collision, and the damage resulting therefrom.

We think it was an error on the part of the Macon to lay astern of the Nedjed in such close proximity to the latter, when it might perhaps have been foreseen that, in order to get afloat, she would come astern. It was, however, one of those errors which do not amount to a fault. It is not clear that the master of the Macon knew to what extent the Nedjed had gone aground. He might have supposed that the tug could control her movements. Be this as it may, the Nedjed was unlawfully in the Macon's water, and athwart her course. The officers of the Macon had but a moment before escaped from a dangerous collision, and the error of judgment in taking too little space astern will not, under all the circumstances, justify a recovery for a collision resulting primarily and mainly from the unmanageable condition of the Nedjed and the grave error of judgment of her officers.

The cause has had the patient and careful consideration its importance, the care exhibited in its preparation, the skill and learning in its discussion, all unquestionably merit, and we have reached the conclusion that it must be dismissed, at the cost of the libelant.

The decree will be entered accordingly.