Mr. Justice SWAYNE
stated the-ease and delivered the opinion of tbe court.
: ■ .This; is a caée of collision. It occurred) on the East River, .’in the afternoon of the 5th of August, 1868,- between tbe yacht Ariel and the sehdouer Grace Girdler. Both vessels were beating down the river to the bay. The yacht bad .-made her long tack, and had gone about near tin New York shore, and'was standing.upon her short tack across the river. The schooner had’done the same things, and was standing ill the same direction. .In going about she had passed to the windward of the yacht, and held that’ position in her short tgck. The yacht was to the leeward, and a very little way in advance. As she was beginning to make headway, the approach of a steam ferry-bpat coming up the river compelled her suddenly-to luff three or four points in order to get out of the way. This threw her unexpectedly in the way of .the schooner, and was the'proximate, cause of the' collision. *197 The vessels came together, and ¡the yacht was sunk and lost. Thp locality of the collision was opposite to the foot'of Stan- , ton or Grand Street, in the city of New'York, and about one-third of the way across the river.
So far both sides agree as to -the facts, but' no further. Here •begins the stress of the.case, and .the antagonists in the tesH-mony of the parties gather around it.
The libellants allege-that the schooner was wholly in fault.; They say that she ought hot to have been so near the yacht; that she ought to have seen the danger to the yacht from the approach of the ferryrboat, and seeing it, ought immediately to have luffed, to get more to the windward; and that if ste had done so, the accident would nof have occurred. They insist that the schooner, being so nearly in the track of the yacht, and in such close proximity, it,was her duty to exercise the greatest vigilance, and to omit -no precaution against danger.
The respondents insist that there was no fault on the part • of the-schooner; that when the yacht suddenly came into her path to avoid the ferry-boat, the schooner, if not in stays, had so little headway on that she was powerless to change her course, or to do anything else to prevent the two vessels from coming in contact. In behalf of the schooner there is testimony to the effect that the yacht, having escaped the ferryboat by luffing, should have luffed still more tp avoid the schooner, and that if she had performed this simple and obvious duty,-the collision could not have occurred.
' The schooner was thoroughly manned. The captain was an experienced seaman. A regular Hurlgate pilot was at the helm.
A pleasure-party was on board the yacht. Lockwood, the captain, was the superintendent of an oil warehouse. He had served as a seaman during a voyage to California in 1849. He had no other nautical experience. Slavin was the sailing-master. He was twenty-two years of age, and had some experience as a sailor. He “had been, off’ and on, five or six' years, sailing-master of those small vessels about New York,” and “ had been on the Ariel six or seven weeks at that time.” *198 Before lie went upon the yacht he had been at work for •Lockwood in an.oil factory. Lockwood, in his deposition,' .says, “'All on board were.gents but Slavin and an extra hand.” The testimony.of the.extra hand has not been taken, and it is not shown who he was, what were his qualifications, or in what capacity he served. It does not appear that any one. was charged witlpthe duty of a look-out.' Lockwood, the cap tain, was at the helm. .He says:
“ The schooner made a longer tack than I, and followed on nearly in our track — a little to the southward. Before I' got ■across the steam ferry-boat Cayuga crossed track on my b.ow.. I luffed a little up to avoid a collision with her, and as I was filling away again, the G-race Girdler came up behind and struck me astern.. Her jib-boom went into my mainsail. We had got about first, and she was about one hundred feet behind us when she-' got about. I did not pay any particular attention to her, as I wás watching the ferry-boat. When I -got clear of the latter, then I saw the Grace Girdler coming down upon us. Mr.-Slavin, the sailing-master, hailed her three times, but received nc answer. She was not further than this room from us when I saw she was coming down on to us. When I saw she was coming I put my helm' hard up, expecting she would go off to the windward of 'me. I also let go my main sheet, to let my vessel run off before the wind; but she hit me before she (the yacht) run off. . . . She could have cleared me by coming up into the wind. . . The ferry-boat was from fifty to seventy-five feet from me. She was bound to Williamsburg, ktid crossed.my bow, and I came within fifteen or twenty feet of hitting her, notwithstanding I luffed. . . . 1 did not suppose it necessary to act to avoid the ferryboat till 'she got near us. 1 luffed three or four points, and con'tinued that long enough to let her run by.”
From this testimony it appears that no véi’y great vigilance was exercised on the yacht to supply the place of a look-out, .and that the judgment formed by the captain as to the danger involved in the appx’oach of the steamer was by no means accurate.
The chief fault' attributed to .the schooner is, that she did not luff into the wind and avoid the yacht by passing to the *199 windward. It is not -denied that the .schooner was to the. windward' after running out her long tack and coming about, nor that she would have avoided the yacht if the vácht had" . nót thrown herself in the Way of the schooner to avoid, the . ferry-boat.
Horton, .the pilot of the schooner, had been a Hurlgate pilot for sixteen years. He says:
“ After we went about, we drawed away our jibs, let up anything forward; saw the yacht to the leeward, about fifty'yards on 'our lee quarter, dead to thé lee quarter. She kept hauling up and nearing us all the while, and we was motionless ah the time, and Ltold them on the yacht to slack the main sheet, but .they paid no attention to me, and came right up to our lpe bow in contact with our jib-boom, which hooked his mainsail. We had not got under headway at the time of the collision. Our jibs had not filled. We could not have done anything in our • condition to avoid it.' • The helm was to the leeward, in the lee'becket dover. When we got around so that the jibs took,' I put my helm down.”
This testimony, if credible, vindicates the schooner and fastens the blame upon the yacht. Perhaps thé reason why the warning of the pilot was not heeded was, that the officers of the yacht had not recovered from the perturbation produced by their narrow escape from the ferry-boat, and that, there was no look-out to give notice of the dangerous-proximity of the schoouer, induced by the new position which-the yacht ha¡d been compelled to assume. The statement of the pilot is fully sustained by the captain and- several of the crew of the schooner who were examined. They all • aver that she had s¡o little headway that nothing could be done on her part to avert the collision.
The sailing-master and gentlemen on the yacht'sustain-more or less fully the facts stated by Captain Lockwood. As usual, those on board on each side acquit their own and condemn the other vessel. The statement of Lockwood is also sustained by McQueen, the pilot of the Cayuga, and by Goodby, the pilot of the Peck Slip ferry-boats. They saw *200 the collision — inculpate the schooner and exculpate - the yacht.
On the other hand, Captain Barber, of the schooner Jenny Lind, who was near at hand and' saw everything that occurred, exonerates the schooner and casts the entire responsibility upon the yacht. Such also is the effect of the testimony of Gilbert, a pilot on the Hunter’s Point line of boats. He too was a spectator. Captain Barber says :
“ I have followed the water eighteen years; and now am master of a vessel. Enow the Grace Girdler. I live in Westerly.' My vessel belongs to Stonington. I was on the schooner Jenny Lind the day of the collision; We went about somewhere near the.coal-yard of the Penn Coal Company at Williamsburg. After we went about we were in the wake of the yacht and the Grace Girdler. All three of us were standing toward New York side. As I was walking back and' forth oh my deck, £ saw the yacht a little ahead of the Grace Girdler. As the latter came up with the yacht she kept off a little .to go under her lee to. clear her quarter. The yacht was a little ab'ead and tacked first, and the Grace Girdler rounded her and came up to the windward. The yacht made headway. The schooner payed off some, and her jib was shaking all the time until they went clear. I don’t see as the Grace Girdler could do anything to prevent this collision, as her head sails were shaking, and her gaff topsails and mainsail full. The schooner’s fore sheets were all slacked up and she payed off and hooked into the yacht. The/schooner bad rio command of herself'. The yacht was not ahead at all after I saw them. I did not see the yacht sink. Saw the schooner sag off on to her.' The yacht ought to have gone around the schooner’s stern or started a sheet and gone off on the other hand.” '
No one bad a better, opportunity of seeing and understand- • ing all that occurred than this witness, and there is> none whose testimony we deem entitled to more weight. There is no impeaching'testimony. The witnesses upon each vessel must have known the condition of things and what occurred there. Unless we impute perjury, which wTe see no reason to do, they are entitled to credence as to this class of facts. As to what occurred upon the other vessel, they are. *201 liable to be mistaken, and their testimony is entitled to less weight than the testimony of witnesses who were present.
, In respect to the yacht, we pass by the inquiries whether she was properly manned, whether she had a sufficient lookout, and whether by due vigilance and good seartfanship she might not at her leisure ‘ have given the ferry-boat a safe berth, and thus have avoided the necessity of placing herself, as it were by a leap, across the bows of the schooner. These'points have not been pressed upon our attention by the learned counsel for the appellants, and in the .view which wé take of the case their solution is not necessary to it's-proper determination. The testimony of those on board of the yacht proves clearly that all was done in the emergency ' that was practicable and proper. ' If there was any omission, under the circumstances it was an error and not a fault. In the eye of, the law the former does not rise to the grade of , the latter, and' is always venial.* For the purposes of' this case..we hold that the yacht was blameless. ' But she su-dx deqly thrust herself before the schooner, and took the latter by surprise. If the testimony of the pilot,- captain, and crew of the schoouer be true, it is indisputable, as is insisted by tb;e appellants, that she had then so little headway as to be impotent to do’anything to prevent the impending catastrophe. . 'Her helm was kept where it should have been to have the greatest effect in turning her head more to the windward. Her jib might have been lowered, to give greater effect to the wind upon- the sails in the after-part of the vessel; but if, as the proof is, it was shaking at the time, this could have had no effect, and would havelbeen useless. This testimony shows that the schooner, as to this part of the ease, was also free from fault. The superadded testimony of Barber and Gilbert leave no room for doubt in our minds upon the subject. ' The loss of the yacht was not produced by a blow from the schooner, but by-the jib-boom of the schooner running through her mainsail, and turning her so far upon her *202 side that she filled with water. As soon as her jib-stay was cut loose'from the anchor of the schooner, she sunk.
But it is insisted that the schooner is blamable for not-having provided, in advance for the contingencies of the approach of the ferry-boat to the yacht, and the sudden transit of the latter to the windward. To this there are two answérs.
, First. The schooner came about near the New York sh,ore, under the stern of the yacht, and was 'passing to the wind-' 'ward of her. Lockwood-expected • the schooner to pass on that side. The witnesses on both sides agree that she was there when the yacht luffed and changed her course three or four points in the same direction to escape the ferry-boat. • It is not denied by any one that but for this- there would have been ■ ample room- between them for both to pass in safety. There is no proof that it was in the power of the schooner to put herself any further to the windward "than shs was. We suppose it will not be insisted that the schooner w'as bound to stop before running out her long tack, or to make it longer.
Secondly. The case made against the schooner is contained in the fourth article of the libel. The charges set forth are confined to omissions at the time of the collision or immediately preceding it. Neither in the pleadings nor proofs is fault charged at any other time. It is nowhere charged or proved that it was the duty of the schooner to have foreseen the contingencies whieh caused the collision, or to have made-any provision against them'. The record .before us is a blank < as to that subject.
It is not intended to impugn anything said by this court in the case of Whitridge et al. v. Dill et al.* as to the rules which should govern-a vessel behind another and pursuing the same course. This case is plainly distinguishable from it in severaL particulars. It is sufficient to mention one of them. In that case there was no sudden change by the leading vessel to a course across the bows of the one behind her. That is the controlling fact in the casé under consideration
*203 , The appellants have inyóked the aid of the act of Congress' of April 29, 1864', “ fixing rules and regulations for preventing collisions on the water.” The 17th article . does, as suggested, provide “that every vessel bvertajdng another vessel shall keep out of the way-of the said last-mentioned vessel.” ■ But the I8th article provides, subject to certain qualifications, that the other vessel shall keep het course; while the 19th aiid 2Qth provide th'at due regard 'shall be had to the circumstances which may render a departure from-the rules prescribed necessary in order - to avoid immediate danger, and that nothing in the act shall warrant the neglect of any proper precaution, or excuse the fault of bad seamanship, under any circumstances that may occur.
It would be a strange result if the statute should make an innpceut vessel liable for an inevitable accident.
In order to recover full -indemnity it is necessary that the. 'suffering vessel should be without fault. Generally the burden-of proof rests upon the libellants. Where fault is-showii on the part of the damaging vessel, it is incumbent on her to show that such fault had in no degree the relation of cause - and effect to the accident.*
Inevitable accident is; where a vessel is pursuing a'lawful avocation in a lawful manner, using the proper precautions against1 danger, and an accident occurs. .The highest degree of caution that can be used.is not required. It is enough that it is reasonable uqder the circumstances — such as is usual in similar cases, and has been found by long, experience to be sufficient to answer, the end in, view — the safety of life and property.† Where there is a reasonable, doubt as to which party is to blame, the loss must be sus-, tained by the party on whom it has fallen.‡
The case of The Thornley,§ though unlike this case 'in its facts, has one- point of resemblance which renders it worthy of attention. That vessel, while “ forging ” her way through' *204 the Nore Sands, was'hailed by the Mentor, a vessel at anchor •near them, to come to anchor. She could'’ not then do so without danger of destruction. Very soon after she passed the Sands a collision occurred. She alleged that it was an inevitable accident. It was,objected (1) that she should' have anchored instead of passing the Sands, and (2) that she should have anchored as soon as she passed them. The Trinity Masters said: “Ve consider the collision accidental. She could not let go her anchor until clear of the Sands; if iti -this case she had let go her anchor, immediately on being clear, the collision would still have.'occurred.” Dr. Lushingtoutook that view of the case, and pronounced against the claim of the .libellants. His judgment proceeded upon the ground that .the Thornley was powerless to prevent the accident. The point that she should have anchored before attempting to pass the Sands was not noticed.
There is another feature of the case before us, to which it is proper to refer. The District Court acquitted the schooner and dismissed the libel. The libellants appealed to the Circuit' Court. That court affirmed the decree.. The, case is now hcjre by a second-appeal. This court ought not to reverse upon a mere difference of opinion as to the weight and effect of 'Conflicting testimony. To warrant a reversal it must be clear .that the lower courts have committed ar error, and that a wrong has been done to the appellants.* This is not a case of chat character. If it were now before us for decision the first time, although our minds are not ' entirely free from doiibt, we could not come to any other conclusion than the one we have announced.
Decree affirmed.

 Reeves v. The Constitution, Gilpin, 587; N. Y. L. & S. Co. v. Rumba, 21 Howard, 383; Propeller Genesee Chief v. Fitzhugh et al., 12 Id. 461

 23 Howard, 448.

 Waring v. Clarke, 5 Howard, 441.

 The Europa, 14 Jurist, 629; The Virgil, 2 W. Robinson, 205; The Lochlibo, 3 Id. 318; The W. V. Moses, 6 Mitchell’s Maritime Register, 1553.

 The Catherine of Dover, 2 Haggard, 154.

 7 Jurist, 659.

 Walsh v. Rogers, 13 Howard, 284; The Marcellus, 1 Black, 414; Ib. The Water Witch, 494; The Grafton, 1 Blatchford, 173; Ib., The Narragansett, 211; Cushman v. Ryan, 1 Story, 95; Ib., Bearse v. Pigs, &c., 322; Tracey v. Sacket, 1 Ohio State, 54.