**WILSON MARINE TRANSIT COMPANY, a corporation, Libelant,**

v.

**PENNSYLVANIA–ONTARIO TRANSPORTATION COMPANY, a corporation,**

and

**THE Steamer ASHTABULA, her engines, etc., Respondent.**

**PENNSYLVANIA–ONTARIO TRANSPORTATION COMPANY, a corporation, Claimant and Cross-Libelant,**

v.

**WILSON MARINE TRANSIT COMPANY, a corporation,**

and

**THE Steamer BEN MOREELL, her engines, etc., Cross-Respondents.**

**Nos. 3616 and 3619.**

United States District Court
N. D. Ohio, E. D.
May 23, 1960.

Johnson, Branand & Jaeger, Cleveland, Ohio, for libelant.

Robert G. McCreary, Jr., of Arter, Hadden, Wykoff & Van Duzer, Cleveland, Ohio, for respondent.

KALBFLEISCH, District Judge.

A collision occurred in the harbor at Ashtabula, Ohio, on September 18, 1958, between the Steamer Ben Moreell, owned by libelant and claimant, Wilson Marine Transit Company (hereinafter referred to as libelant), and the Car Ferry Ashtabula, owned by respondent and claimant, The Pennsylvania-Ontario Transportation Company (hereinafter referred to as respondent).

Admiralty No. 3616 was commenced by the filing of the libel of the libelant against the respondent, wherein $143,-173.16 is sought as damages, alleging that the collision between the Moreell and the Ashtabula was due solely to the fault and negligence of the Ashtabula.

Claim and answer has been filed by the respondent, denying any fault or negligence on its part and alleging that said collision was the sole fault of the Moreell, and raising as an affirmative defense, in the event the Ashtabula should be found liable in whole or in part for said collision, the right to claim limitation of liability.

In addition to filing its answer to the libel in Admiralty No. 3616, The Pennsylvania-Ontario Transportation Company has filed a cross-libel for damages to it and its Car Ferry Ashtabula, alleging sole fault on the part of the Moreell and claiming damages in the sum of $475,000, to which Wilson Marine Transit Company, by claim and answer, has made its denial.

In Admiralty No. 3619, in addition to raising the defense of limitation of liability in its answer to the libel, The Pennsylvania-Ontario Transportation Company has filed its petition for exoneration from or limitation of liability, again asserting its right to limit all liability and alleging that because of said collision no freight was earned and that, taking into account the necessary expenses incurred in salving the car ferry, the amount or value of her owner's interest in the Car Ferry Ashtabula following the collision and sinking aforesaid was and is zero.

The only claim filed in Admiralty No. 3619 is that of Wilson Marine Transit Company, and by its answer to the petition it denies petitioner's right to limit its liability and denies the valuation asserted by petitioner as to its interest in the Ashtabula and pending freight.

Upon the motion of Wilson Marine Transit Company and with the approval and consent of petitioner, the Court entered an Order for Reference for Appraisal appointing J. Harold Traverse, Esq., as Commissioner to ascertain the

interest of petitioner in the Car Ferry Ashtabula immediately following the collision.

At pretrial hearing held January 12, 1960, before Judge Jones, it was agreed that Admiralty Nos. 3616 and 3619 would be consolidated. However, it was agreed and ordered that trial of the issue of limitation of liability raised by The Pennsylvania-Ontario Transportation Company by its answer in Admiralty No. 3616 and by its petition in Admiralty No. 3619 would be deferred pending the outcome of Admiralty No. 3616 and that in the latter action libelant Wilson Marine Transit Company would proceed first with its proof.

The absence of dispute as to certain facts and circumstances permits an appreciable shortening of this memorandum. The parties agree upon the jurisdictional facts, the relationship of the parties, and the characteristics and dimensions of the vessels. In fact, there is a complete agreement upon all matters in issue at this stage of the case except as to the issue of fault or negligence which caused the collision.

On the evening of September 18, 1958, at approximately 7:35, the Steamer Ben Moreell had discharged a cargo of iron ore at Union Dock in the inner harbor at Ashtabula, she put her engines and sailing equipment in readiness, and called upon two tugs to assist her to depart. The Moreell, being without cargo, took on water ballast in her tanks until she was drawing 17 feet aft and 6 feet forward. The Moreell had docked port side to, headed south. The Tugs Michigan and Missouri responded to the Moreell's call by the Michigan taking the stern line and the Missouri the bow line and, being towed, the Moreell departed the dock stern first at 7:45 p. m.

The Moreell's duly licensed master, Captain Murdock McQueen, was in charge of her navigation. Captain McQueen has been sailing on the Great Lakes for forty-two years. He is sixty-two years of age, was first licensed in

April of 1920, received his master's or captain's license in 1924, and has sailed as a master for thirty-two years. At all times hereinafter mentioned, he occupied a position in the pilothouse at an open forward window in proximity to the wheel and the Wheelsman, Donald Holso. His position was approximately 40 feet above the surface of the water, affording him a view over the breakwaters, east and west, and of Lake Erie proper. The Moreell was equipped with lights in accord with law.

At 7:47 p. m., Captain McQueen made a security call, which was answered by the Car Ferry Ashtabula on channel 51 of the radiotelephone. Captain McQueen testified that Captain Sabo, of the Ashtabula, informed him that the Ashtabula was approaching the harbor and was "coming on in" and would be in in about ten minutes; whereupon Captain McQueen suggested to Captain Sabo that they pass on the one-whistle side in the harbor, to which Captain Sabo agreed. Captain McQueen further testified that the maneuver of departing the dock and winding in preparation to leave the harbor in his past experience required about ten minutes and that he expected the Ashtabula to be inside the harbor by the time the Moreell got under way on her own power.

When the tugs were cast off, completing the winding operation, the Moreell's engines, at the direction of Captain McQueen, were operated half speed ahead, the wind was northwest 20 to 25 miles per hour and, although it was dark, the visibility was very good. The Moreell's rudder was at midship when Captain McQueen ordered slow speed. At this point Captain McQueen executed the one-blast signal and he could see the Ashtabula about a quarter to a half mile outside the entrance to the harbor, at which time the Ashtabula answered with a one-blast whistle, thus confirming the previous agreement to meet port to port. The Moreell was being steered visually (not by compass), with a heading on the east pierhead light. Captain McQueen fur-

ther testified that the Moreell's course was east or to the right of center of the harbor, and because he detected a sagging of the ship from the wind he ordered full speed ahead. The Moreell continued full speed ahead for approximately a minute and a half, during which time Captain McQueen observed the Ashtabula making her turn into the harbor entrance. In his opinion the Ashtabula was making an excellent turn, which he anticipated would be completed without incident. When the stems of the Moreell and the Ashtabula were approximately 650 feet apart, Captain McQueen heard the Ashtabula's two-blast whistle and observed the Ashtabula swing to the left on a course across the Moreell's bow, whereupon Captain McQueen ordered full speed astern and the rudder hard left, and the ships collided with the stem of the Moreell entering the starboard side of the Ashtabula at approximately 75 feet aft of the Ashtabula's stem. Captain McQueen estimated the point of impact to be 150 to 200 feet south of the Ashtabula breakwater light and east of the center of the harbor. The nature and amount of damage to each vessel are not in issue at this time.

The testimony of Captain McQueen as to the winding operation and as to the various speeds of the Moreell is corroborated by the Chief Engineer, Mr. Harold R. Morse, and the Assistant Engineer, Mr. William Aker. The Captain's testimony in regard to the positions of the Moreell and the Ashtabula at various times, and as to the signals between the vessels, is corroborated by the Third Mate, Gerhardt Winkle, the Wheelsman, Mr. Donald Holso, and the First Mate, Mr. Andres Trygg, all of whom were members of the crew of the Ben Moreell. The witness Walter Merrill, Tug Fireman on the Tug Michigan, corroborated Captain McQueen's testimony as to the winding operation and as to the position of the Moreell east of the center of the harbor as the Moreell proceeded on a heading toward the outer green light (east pierhead light).

The libelant also called Captain Harry Elsmore and Captain Walter Dunmar as expert witnesses.

The respondent, in defense to the libel and in support of its cross-libel, offered the testimony of Fred M. Link, Secretary-Treasurer and Manager of The Pennsylvania-Ontario Transportation Company, who described the Ashtabula, its cargo, and the operation of the car ferry. He identified respondent's Exhibits A, B, C and D as being the log of Captain Sabo, the Mate's log, the Engineer's log, the radiotelephone log, and a photograph. Mr. Link testified that Captain Sabo was first employed on the Car Ferry Ashtabula as an Able Seaman in March of 1927, that he remained on the Ashtabula in various capacities, in the following order: Watchman, Wheelsman, Third Mate, Second Mate, First Mate, Relief Captain in 1953, and in September 1954 he became Master of the Ashtabula and remained so until the date of the collision, having made between 800 and 820 round trips in and out of Ashtabula Harbor. He further testified that the Ashtabula traded between Ashtabula Harbor and Port Burwell in Canada, and that on the day of the collision the Ashtabula was returning from Port Burwell with a cargo consisting of twenty-two railroad cars, eleven of which were loaded with stone, one car of newsprint, and ten empty cars. The witness Link further testified that the Car Ferry Ashtabula was equipped with a double plated bow for navigation in ice. He further testified that Captain Sabo died subsequent to the collision and prior to this trial. The respondent, The Pennsylvania-Ontario Transportation Company, owned and operated one vessel, the Car Ferry Ashtabula, and because of her destruction in the collision with the Moreell her forty-two crew members were paid and were no longer employees of said respondent after September 19, 1958. This fact that the members of the crew were no longer employees of The Pennsylvania-Ontario Transportation Company at the time

they testified is entitled to some consideration—much or little, as the case may be—as affecting the weight of their testimony and their credibility. The witness Link further testified that the Ashtabula was raised and, with the approval of the libelant, was sold for $33,000, from which amount $775.09 was deducted as expenses of said sale. The balance of $32,224.91 is deposited, in United States Treasury bonds, with C. B. Watkins, Clerk of this Court, subject to further order of this Court.

From the testimony of Captain Louis Sabo I find that he obtained his pilot's license in 1937 and his master's license in 1949. He was employed in various capacities on the Car Ferry Ashtabula for thirty-one years prior to this collision. He had sailed on other vessels for eleven years prior to his employment on the Car Ferry Ashtabula. Captain Sabo testified that on the date of the collision the departure of the Car Ferry Ashtabula from Port Burwell was without incident. She proceeded south 10 degrees east toward Ashtabula Harbor, and at approximately 7:10 p. m., when the Car Ferry was several miles from the harbor she made a safety call by radiotelephone, announcing that she was approaching the harbor, which call was responded to by a Canadian vessel which advised that it was coming out of the harbor, whereupon the Ashtabula changed course to the easterly and then to the northwesterly until the Canadian vessel was outside the harbor. The Ashtabula then reversed her course and headed on the east breakwater light, in a southeasterly direction, toward the harbor entrance. It was estimated that the wind, which previously had been as high as 35 miles per hour, was at the time heretofore mentioned northwesterly at 20 to 25 miles per hour. The experts characterized this wind velocity as moderate, but there were substantial swells running in the lake. These swells were described as a "lumpy sea." The Ashtabula was proceeding at her regular speed of 12.9 miles per hour. There was a strong current from west to east across the harbor entrance and the existence of this current was known to both Captain Sabo and Captain McQueen. As the Ashtabula proceeded on the southeast course and was about two miles from the Ashtabula lighthouse, a security call was heard on radiotelephone from the Steamer Ben Moreell announcing that she was leaving Union Dock with two tugs. Captain Sabo testified that the Ashtabula then called the Moreell and stated, in effect, that the Ashtabula had changed course recently and that she could not turn around due to the condition of the sea and its effect on her cargo, and that she was coming on into the harbor and would be in the harbor in about ten minutes. Captain McQueen, on the Moreell, denied that he heard any statement from Captain Sabo as to the condition of the sea and its effect upon the cargo of the Ashtabula, but admitted that Captain Sabo stated that he was coming on into the harbor and would be in in about ten minutes. On this point Captain Ralph Fenton, Master of the Walter E. Watson, testified that he heard the conversation between Captain Sabo and Captain McQueen and that Captain Sabo did advise Captain McQueen of the condition of the sea, which was throwing his cargo, and for that reason the Ashtabula was coming on into the harbor. In answer to this security call by the Ashtabula, Captain McQueen, Captain Sabo and Captain Fenton each testified that the Moreell assented to the Ashtabula's coming on into the harbor and proposed that the vessels meet in the harbor port to port on the one-whistle signal. This proposal by the Moreell was agreed to by the Ashtabula.

On the course which she was steering, it was necessary for the Ashtabula to make a 75-degree turn in order to enter into the harbor and keep to a course parallel with the west breakwater on the Ashtabula's side of the harbor. It is necessary to bear in mind that the Captain of the Moreell stated that the visibility was good and the lights of the Ashtabula.

were discernible to him before he sounded the one-whistle signal and at all times thereafter. Captain Sabo admitted that the lights on the Moreell were clearly visible to him; however, because of the angle of his vision and the presence of the west breakwater, he was incapable of ascertaining upon which side of the harbor the Moreell was navigating. Captain Sabo assumed that the Moreell would navigate as far to starboard as was reasonable and that she would hold back in the harbor to allow the Ashtabula sufficient sea room to complete her turn. However, he admitted that Captain McQueen did not say he would hold back, nor did he (Sabo) ask McQueen to hold back. The Ashtabula was one-half mile northwest of the red west breakwater light and the Moreell had completed her winding and was getting under way when the Moreell sounded a one-whistle signal, to which the Ashtabula responded with a one-whistle signal. Captain Sabo testified that he directed the Wheelsman to begin his turn into the entrance to the harbor when approximately one-quarter to one-half mile to the northwest of the entrance. He had ordered the Wheelsman to "work around slow and to hold close to the west pierhead light" and the Wheelsman followed Captain Sabo's directions. As the Ashtabula "got about abreast of the red pierhead light" Captain Sabo gave an order "to turn hard right." The Ashtabula at that time was approximately 50 feet east of the west breakwater light. Captain Sabo testified that he was at a window in the pilothouse, about one or two steps forward of the wheel, when the bow of the Ashtabula was approximately 200 to 300 feet inside the harbor entrance on a 159-degree heading, and then for the first time he was able to definitely ascertain the position of the Moreell, which he stated was west of the center of the channel, and that the bow of the Moreell was about 700 feet from the bow of the Ashtabula. He concluded that if the Ashtabula were to continue on hard right a head-on collision would occur. He reacted to this conclusion by taking the wheel from the Wheelsman, and turned the wheel hard left as far as it would go and blew a two-whistle signal twice to signal that he was changing course to the left, believing that he could pass to starboard of the Moreell. He stated that the collision occurred at approximately 525 feet inside the entrance to the harbor, and he marked the place of collision on respondent's Exhibit F. In the collision the stem of the Moreell struck and penetrated the starboard side of the Ashtabula between 75 and 80 feet aft of the Ashtabula's stem. It was Captain's Sabo's estimate that the Moreell was traveling seven to eight miles an hour in the center or to the west of center of the harbor when the ships were 700 feet apart, that at the time Captain Sabo took the wheel to change course from hard right to hard left the Moreell was three points on the starboard bow of the Ashtabula, or approximately thirty degrees on the Ashtabula's starboard bow, and that the Ashtabula continued to swing right about one point—eight or ten degrees—after Captain Sabo put the rudder to hard left. Thereafter, the Ashtabula swung to port on hard left rudder, the Moreell having executed a hard left rudder with its engines reversed full speed, which resulted in the collision's occurring when the Moreell was six points off the starboard bow of the Ashtabula. Captain Sabo testified that he was navigating the entrance by land mark and that the lights on shore affected his ability to clearly determine the location of the Moreell until the Ashtabula had proceeded about half a boat length through the entrance. A considerable amount of testimony was devoted to what happened after the collision, none of which appears to the Court to be of great significance, except that the ships moved in a circle, clockwise, with the stem of the Moreell in the side of the Ashtabula, that in this circling motion the stern of the Moreell cleared the west breakwater by approximately 75 feet, and that the Ashtabula sank with the top deck afloat.

The witness Arvo Edwin Wütala, fifty years old, was Wheelsman on the Ashtabula on the date of the collision. He corroborated Captain Sabo as to weather conditions, as to the security calls of the Ashtabula and the Moreell, and as to the previous turning of the Ashtabula and its effect upon her cargo, and he further testified that Captain Sabo informed Captain McQueen "Can't roll cars any more. I got to come in." Wütala further testified that the one-whistle signals were exchanged when the Ashtabula was about one-quarter mile out of the harbor and that Captain Sabo instructed him to "bring her around the pier as close as you can," and that when the Ashtabula was 700 feet out of the entrance she was not yet north of the west pierhead light, at which time the witness put the rudder one and one-half turns to the right, and when the Ashtabula was 350 feet outside the entrance he put the rudder hard right, which required two and three-quarter turns of the wheel. He testified that the Ashtabula passed the pierhead 50 feet out heading on the end of the Union Dock. He then saw the Moreell 600 to 700 feet distant in the center of the channel. He further testified that the Moreell was three points on the starboard bow of the Ashtabula and that Captain Sabo took the wheel and put it hard left, that the Captain blew a two-blast signal twice and that, in his opinion, had the Ashtabula continued her turn to the right the ships would have collided head-on, or sideswiped. This witness stated that the current at the entrance did not appear to affect the Ashtabula, but he also stated that the Ashtabula was drifting to eastward and the whole ship was moving sidewise, and that when Captain Sabo took the wheel the stems of the Ashtabula and the Moreell were 500 feet apart.

The witness Walter G. Ribo, forty-two years old, was a Watchman and Wheelsman on the Ashtabula, and had started as a Lookout in 1951. He corroborated Captain Sabo as to the wind velocity and as to the rolling of the Ashtabula when it turned to permit the Canadian vessel to leave the harbor. He verified the one-whistle signals and stated that he saw the Moreell's lights, but he, also, could not tell the position of the Moreell in the harbor. He was on the forecastle of the Ashtabula when it entered the harbor, and was on the starboard bow when the Ashtabula passed the west pierhead light and he saw the pier 50 feet away, at which time the Ashtabula was swinging to the right. This witness then saw the Moreell in the center of the channel, bearing three or four points on the starboard bow of the Ashtabula. He estimated the Moreell to be traveling four miles per hour. He heard the Ashtabula's two-blast signal, and saw the Ashtabula swing "a little bit left before the collision." It was his opinion that had the Ashtabula not swung to port and had she continued to swing right the ships would have collided head-on.

The witness Herman Schleim, fifty-eight years old, was the Chief Engineer of the Ashtabula, and he corroborated the Captain as to the speed of the Ashtabula.

The witness John Clapp, thirty-three years old, now employed as a molder in a fiberglass body company, had been on the Ashtabula a year and a half. He was Third Assistant Engineer, and testified that he was at the starboard throttle at the time of the collision, and he corroborated the Captain as to the rolling of the Ashtabula prior to her entrance into the harbor on the occasion of the collision.

The witness James Pinelli, First Class Pilot, had sailed on the Ashtabula for five years, and he corroborated Captain Sabo as to the navigation of the Ashtabula to permit the Canadian vessel to leave the harbor and as to the rolling of the Ashtabula, and testified that at the time of the collision he was aft of the midship house. He further testified that he saw the lights of the Moreell when the Ashtabula was five minutes out of the harbor, that he observed the navigation of the Ashtabula as it entered the harbor on a heading which he estimated to be 160 to 165 degrees true, and that the Ashtabula passed the west pierhead

at a distance of 50 to 75 feet. He testified that the stern of the Ashtabula was just clear of the west pierhead light when the Ashtabula's second two-blast signal was sounded.

Captain Melvin Joseph Bishop and Captain Henry Martin Gates, experienced masters and captains of ships on the Great Lakes, who were familiar with Ashtabula Harbor and the ships involved in this collision, appeared as expert witnesses. It was their opinion that the Ashtabula could be controlled best at full speed and, after explaining the various characteristics of the Ashtabula and its maneuverability, they stated that in their opinion, under the circumstances at the time Captain Sabo first ascertained the location of the Moreell, Captain Sabo's only chance to avoid the collision was to follow the course which he pursued, and that had Captain Sabo continued on right rudder a more serious collision would have occurred. Captain Gates testified that in his opinion the Ashtabula on hard right rudder would go at least to the center of the harbor and south 1,000 feet. He also stated that to avoid this swing to the center of the harbor the Ashtabula would have to come in at a different angle so as not to be carried southeast during the turn.

The witness Neil N. Barton testified that at the time of the collision he was a member of the Coast Guard at the Ashtabula Lifeboat Station, where he had been on duty since July 1955 as a Watch Tender at the lighthouse. The lighthouse to which he referred is marked with a penciled circle on respondent's Exhibit K. To summarize his testimony, I find that he had observed the Moreell periodically following the winding operation and up to the time of the collision. He stated that the Moreell was taking a course parallel to the west breakwall, slightly to the west of the center line of the harbor. The point of collision and the course of each vessel, according to his testimony, is illustrated on respondent's Exhibit K.

The actual point of collision is regarded by both counsel as being of impor-

tance, since it would permit inferences to be drawn as to the positions of the vessels in the harbor prior to the collision. The testimony of the crew members of the respective vessels, and of Neil N. Barton on the one side and Walter Merrill on the other, illustrates the equal balance of the evidence as to the point of collision and, in my judgment, this same equal balance of the evidence prevails as to every pertinent fact necessary to be established in determining fault and liability.

Anthony Suarez, of Ridgeville, New Jersey, an engineer specializing in hydrodynamics, who was called on behalf of the respondent, explained his specialization and his connection with the Davidson Laboratory. He testified as to studies and experiments he had conducted with the facilities at his disposal, including data as to the construction and characteristics of the vessels involved herein, and, because of his education, training and experience, he was qualified to express opinions as to the maneuverability of the Moreell and the Ashtabula. He related his findings as to the speeds each vessel would attain under given conditions. He further stated his findings as to the distance the Ashtabula would advance in executing turns of various degrees, and stated that a turn from 135 to 210 degrees would result in an advance, or forward movement, of the ship of 1,260 feet, which would require 76 seconds at 12.9 miles per hour. Although his opinions were formed without regard to wind and current, he advised that a current would increase the turning circle and set the ship to the east, and that a northwest wind would set the Ashtabula in an easterly direction. It does appear from the testimony of the expert witnesses that Captain Sabo was correct in concluding that to maintain a hard right rudder in the Ashtabula's swing into the harbor would have resulted in a head-on or serious collision.

The first time the Ashtabula approached the harbor a security call revealed that a Canadian vessel was departing the harbor, and the Ashtabula

turned east, then to the northwest, and then turned to a heading southeast to allow the Canadian vessel to depart the harbor, and in making this turn the cargo of the Ashtabula was affected sufficiently to cause Captain Sabo to be greatly concerned as to the advisability of repeating the maneuver. This evidence on behalf of the respondent is not contradicted. It also is not contradicted that security calls were exchanged between the Ashtabula and the Moreell as the Ashtabula approached the harbor a second time and as she was pursuing a course southeast toward the harbor entrance and the Moreell was preparing to depart the dock.

A slight contradiction appears as to the context of the conversation between the Captains of the respective vessels during the security calls. Captain Sabo and Captain Fenton testified that Captain Sabo advised Captain McQueen that he could not turn the Ashtabula around again because it would throw his cargo, and that the Ashtabula was coming on into the harbor. While Captain McQueen denied hearing that part of Captain Sabo's conversation having to do with throwing the cargo around, he admitted that Captain Sabo advised that the Ashtabula was coming in and would be in the harbor in ten minutes. I regard this contradiction as of slight significance in view of the Captains' ultimately agreeing to meet in the harbor on a one-whistle signal. Each Captain was fully aware of and in agreement as to the velocity of the wind, as to the visibility's being good, as to the fact that each was able to discern the lights of the other and that the vessels bore such lights as were required by law.

The evidence on behalf of the libelant as to the navigation of the Moreell in departing the dock and as to the winding operation is not contradicted. There is no dispute that following the winding operation the Moreell moved under a throttle of half speed ahead, then checked to slow speed, and then "rang up" full speed ahead, and the Moreell had proceeded full speed ahead for between one and two minutes when her engines were reversed immediately prior to the collision. However, the respondent takes issue with the libelant as to the course steered in the harbor by the Moreell. There is no dispute that the starboard side of the Ashtabula, in turning into the entrance, passed within 50 feet of the outer end of the west breakwater. There is no dispute as to the relative positions of the vessels when the one-whistle signals were exchanged. There appears to be a very slight contradiction as to the distance between the two vessels at the time the Ashtabula entered the harbor. There is no dispute that at the time the Ashtabula was about a half boat length, or approximately 200 feet, inside the harbor entrance the Captain of the Ashtabula seized the wheel and turned it from hard right to hard left rudder, and gave a two-blast signal. There is no dispute that, upon hearing the two-blast signal and seeing the effect of the change in the steering of the Ashtabula, the Moreell applied a hard left rudder and her engines were reversed from full ahead to full astern.

■ The custom or practice on the Great Lakes requiring an inbound vessel to remain outside to permit an outbound vessel to depart a harbor, as was testified to in the expert testimony, does not apply here because the Captains agreed to meet in the harbor. Neither party claims, nor has there been any showing, that the agreement to meet port to port in the harbor was ill-judged, ill-advised, or a violation of any of the standards of proper action. However, each party accuses the other of sole fault in the navigation of the respective vessels in carrying out the agreement.

■ It has been established beyond a reasonable doubt that a critical situation existed at the time Captain Sabo seized the wheel and the vessels were between 600 and 700 feet apart. Counsel for each side, with commendable and expert skill, endeavored to satisfy the Court, by evidence and argument, as to where the

fault and liability lay in producing this critical situation. The delay in rendering this judgment has been occasioned partly by the hours devoted by the Court to a study of the authorities as they applied to the facts in this case. At the very close of the trial I had the abiding conviction that a fault had been committed to cause this collision. I was unable then, as I am unable now, to locate the fault in one or the other vessel, or to determine whether both vessels were at fault. I have examined the briefs of counsel, the so-called "Pennsylvania Rule," the "New York Rule," the rule applied to the conduct of vessels when "in extremis," and many other authorities thought to be applicable to the facts in this case. The libelant urges that the sounding of the two-blast signal by Captain Sabo and his putting the wheel of the Ashtabula hard to the left were violations of the law. However, in view of my findings that emergency conditions existed at that time and that Captain Sabo acted in extremis, and further finding that Captain Sabo's conduct was reasonable, it would be improper to hold the Ashtabula at fault. By reviewing, again and again, the evidence in this case, and recognizing that liability must rest on fault, I have concluded that the proof fails to establish who was at fault.

My conclusions that the vessels were pursuing a lawful avocation in a lawful manner and that the evidence is so conflicting that it is impossible to determine to what direct or specific acts the collision is attributable bring this case within the rule of "inscrutable fault," as defined in the following cases: The Worthington and Davis, D.C., 19 F. 836; The Jumna, 2 Cir., 149 F. 171; and The Grace Girdler, 7 Wall. 196, 74 U.S. 196, 19 L.Ed. 113. The seemingly settled rule is that in such a case no one can recover anything. If liability must rest on fault, there can be no liability where proof fails as to who is at fault; in such a position, no one has made out a case on which liability can be predicated. Having carefully examined the exhibits and observed the witnesses during the trial, the end result of each party's being required to pay its own loss is in accord and harmonizes with the Court's concept of justice under the evidence and the law in this case.

By virtue of these findings and conclusions, it is the judgment of this Court that neither party is entitled to recover. Prepare entry accordingly.

If it is considered necessary or required that findings of fact and conclusions of law be adopted under Admiralty Rule No. 46½, 28 U.S.C.A., libelant may prepare and present them for the Court's consideration.