**CHANNEL MARINE FUEL COMPANY, Plaintiff,**

v.

**TUG ROELROY, her engine, tackle, apparel, etc., and H & S Towing Co., Inc., Defendants.**

**Civ. A. No. 66–459.**

United States District Court
E. D. Louisiana,
New Orleans Division.

May 14, 1969.

Patrick L. Burke, Faris, Ellis, Cutrone, Gilmore & Lautenschlaeger, New Orleans, La., for plaintiff.

N. B. Barkley, Jr., Lemle & Kelleher, New Orleans, La., for defendants.

CASSIBRY, District Judge:

Plaintiff, Channel Marine Fuel Company, seeks to recover damages to its barge PATCO-10 caused while the Tug ROELROY, owned by defendant H & S Towing Co., Inc., was entrusted with the barge as a tow on a voyage from Bayou Long Field, near Morgan City, Louisiana, to Westlake, Louisiana.

On May 11, 1966, at 7:30 A.M., the Tug ROELROY[1] and tow departed Bayou Long Field, located approximately 35 miles north of Morgan City, Louisiana on the Intracoastal Waterway, Morgan City-Port Allen Alternate Route, and proceeded on her voyage to Westlake, Louisiana. The flotilla was under the command of Royal Hymel, part owner of the ROELROY and an unlicensed mariner, who was assisted by a relief-captain and wheelman. Her tow consisted of the unmanned Tank Barges BILL LUECK

---

1. The ROELROY, approximately 45′ in length, 15′ in breadth, and 400 h. p., is owned by H & S Towing Co., Inc. The corporation is equally owned by Royal J. Hymel, Roland Stephens, and Elliot Stephens.

and PATCO-10,[2] both of which had been fully loaded with crude oil at Bayou Long Field under the supervision of the crew of the ROELROY. The PATCO-10, owned by Channel Marine Fuel Company, was loaded to approximately 7' fore and aft, leaving an 18" freeboard.

After leaving Bayou Long Field, the Tug ROELROY experienced a generator failure and, after continuing down the waterway for an additional two hours, it reached an inlet or harbor into which it towed its barges and tied them up there. This harbor is located on the West bank of the Intracoastal Waterway about one mile north of Morgan City, Louisiana. The inlet or harbor into which the ROELROY deposited its barges is a dredged-out area from which soil had been obtained for building a levee on the East bank of the Intracoastal Waterway. It is approximately 1,-200' to 1,800' in length, 300' in width at the opening, and much wider thereafter, and 6–7' in depth. This harbor area was rather extensively used by marine interests to moor barges temporarily. There is no evidence of any other accidents in the inlet during the preceding ten years.

For more than one year prior to this accident, the ROELROY, towing for Continental Oil Company, had been making this same trip with the same barges from Continental's Bayou Long Field to its Westlake Refinery near Lake Charles via the Gulf Intracoastal Waterway, including a portion of the Morgan City-Port Allen Alternate Route. On each trip the tow would be loaded from the several tank batteries located in the field, towed to the refinery, discharged and then returned, light, to the field for reloading. During the trips the ROELROY and her tow would regularly pass Morgan City, the tug's "home port" where she routinely took on supplies of groceries, fuel and, when necessary, would undergo repairs. On each occa-

sion the tow would be tied off in the same place where the accident occurred in the instant case and the tug would then proceed, light boat, to Morgan City. On the numerous occasions that Captain Hymel had moored his tows in the harbor, both during the day and/or overnight, the barges were tied off, but not lighted, and this was common practice among those who used the inlet.

Royal Hymel's sketch, which is a part of his deposition in the record, sets forth rather clearly the position where he placed the barges in the harbor. The barges were in line with one another with the PATCO-10 on the outside and the BILL LUECK tied off with cables to two trees on the extreme west end of the inlet. There were other barges tied up on both sides of them. The barge on the South side was 50 feet away from and parallel to the PATCO-10. PATCO-10 was to an extent protruding into the harbor approximately 300 feet from the western end, and at least 200 feet from the north side.

The ROLEROY and its crew departed for Morgan City from the inlet around 1:00 P.M., leaving no one aboard the barges, nor placing any lights on them. Their purpose was to get one of the tug's generators repaired and also to take on fuel and supplies.

Upon arriving in Morgan City at approximately 1:30 P.M., the ROELROY proceeded to Stephens Diesel Service but learned that the yard would not be able to begin repairs until sometime later that evening. It then departed the yard, obtained fuel and supplies which took approximately two and a half hours, and returned to Stephens Diesel Service to await her turn for repairs. The Captain and crew left the tug with the understanding that they would be called by Stephens when the repairs were completed. In addition to repairing the generator, Stephens was instructed to make any other additional repairs in the na-

---

2. Both barges were of the same size and, according to Merchant Vessels of the United States, the Tank Barge BILL

LUECK is 150' in length, 36' in breadth, and 8.6' in depth.

ture of general maintenance that were considered necessary.[3]

The next morning, May 12th, upon being notified that the repairs had been completed, the Captain and crew boarded the ROELROY and proceeded to the inlet to pick up her tow and resume the voyage. Upon arriving at the inlet at approximately 4:30 A.M., the BILL LUECK and PATCO-10 were found next to the north bank of the inlet, with the BILL LUECK's port mooring cable parted and the PATCO-10 in a damaged condition. The PATCO-10's damages consisted of damage to her on-deck piping, motors, pumps, fuel tanks and cargo hoses. As the damage was limited to deck equipment, it was believed that the PATCO-10 had been overrun by an empty barge in tow.

Following discovery of the damage to the PATCO-10, the ROELROY returned to Morgan City, where Captain Hymel notified his insurance agent and his partner Roland Stephens of the damage. Roland Stephens accompanied the Captain back to the inlet and observed and photographed the damage, after which time, the barges were made up to the ROELROY and the voyage was resumed to Westlake. After the PATCO-10 was unloaded, it was towed to Fredeman's Calcasieu Locks Shipyard, Inc., at Carlyss, Louisiana, for repairs. The barge was surveyed and repairs were effected at the cost of $8,275.00, exclusive of charges for detention and survey fees. Plaintiff contends that it is entitled to recover this amount.

■ Defendant was under a duty to exercise "reasonable care and skill as prudent navigators employ in the performance of similar services," however, it "is not normally a common carrier or bailee of the tow, nor is it an insurer of the safety of the tow." Sanders v. Meyerstein, D.C., 124 F.Supp. 77. An earlier case defined the duty as follows:

"The highest degree of caution that can be used is not required. It is

enough that it is reasonable under the circumstances—such as is usual in similar cases, and has been found by long experience to be sufficient to answer the end in view." The Grace Girdler (1868), 7 Wall. 196, 74 U.S. 196, 19 L.Ed. 113; The Lapwing, 150 F.2d 214 (C.C.A., 5th Cir. 1945).

■ Plaintiff claims defendant was negligent in three respects, (1) The tug ROELROY was unseaworthy in that its generator failed requiring Hymel to tie up the barge in an exposed and dangerous place and go into Morgan City for repairs. (2) The PATCO-10 was left in an exposed position, unattended and unlighted during a period of darkness, in an area known to be heavily traveled by other vessels. (3) The ROELROY failed to return to the PATCO-10 and place a light on it before dark when it was known that the voyage would not be resumed until the next morning.

The ROELROY was adequate in every respect for its task. It had performed this same job innumerable times. It was not even rendered incapable of performing its job by the breakdown of the generator because it had another generator which was operative and the tug would have been able to complete the voyage without any repairs. ROELROY did not stop at Morgan City for the sole purpose of effecting repairs to the generator but to get supplies and fuel, which it had done regularly since it had been making these trips, and at the same time repair the generator. The breakdown of its generator did not, therefore, render it unseaworthy or unfit to perform its job.

The PATCO-10 was left in a harbor overnight and unlighted, but it was placed well inside the harbor out of the line of navigation and in relative safety. The harbor was regularly used and had proved to be safe since there had been no accidents in it for several years. Hymel's conduct here was not imprudent or unreasonable. Considering his previ-

---

**3.** In addition to owning ⅔'s of the stock in H & S Towing Co., Roland and Elliot

Stephens operated Stephens Diesel Service.

ously acquired knowledge and experience in mooring there over the years, he could not have reasonably foreseen that his barges would have been damaged. Moreover, there was no maritime regulation requiring that the barges be lit. 33 C.F.R., Section 80.16a(h)3. Interestingly enough the barge may have been damaged in daytime since it was moored there fully five hours before dark. I might just as logically have surmised or inferred that the barge was damaged in daylight and, in that event, not placing lights on it would have been of no consequence.

I am convinced that the defendant's conduct was reasonable and prudent and defendant is not liable for the damage sustained by PATCO-10.