CITY OF NEW ORLEANS for Use and Benefit of SEWERAGE AND WATER BOARD OF NEW ORLEANS

v.

UNITED STATES of America Through DEPARTMENT OF the ARMY, New Orleans District Corps of Engineers, Williams–McWilliams Co., Inc., Dredge Arkansas, etc., and Hartford Ins. Co.

Civ. A. No. 78–2301.

United States District Court,
D. Louisiana.

Oct. 28, 1980.

Gerard M. Victor & John A. Gordon, New Orleans, La., for plaintiff.

Bert M. Cass, Jr., New Orleans, La., Thomas L. Jones, Torts Branch, Dept. of Justice, Washington, D.C., for defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

BEER, District Judge.

To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any conclusions of law constitute findings of fact, they are so adopted.

### Findings of Fact

1. On August 4, 1977, at approximately 3:25 a. m., Feeder 26, a 4 6600 volt submarine type cable, owned and maintained in operation by the Sewerage & Water Board of New Orleans, or its landside components, ceased functioning according to the official report of Mr. Leonard Harding, Pump and Power Plant Operator for the Sewerage & Water Board, who was on duty that morning.

2. Feeder 26 is located landside on both sides of the Mississippi River and, also, crosses the Mississippi River from the east bank at Bienville Street to the west bank at Bounty Street (in Algiers). It was, at all times pertinent, the primary power connection between the Sewerage & Water Board power plant on the east bank and the Sewerage & Water Board facilities on the west bank. The location of Feeder 26 is marked by a cable crossing sign approximately 12' × 3' which is located above the east bank (Bienville Street) wharf and which was duly noted and acknowledged by those in charge of the dredging activities hereafter described.

3. At approximately 7:00 a. m., Mr. Tim Talbot, Plant Electrician for the Sewerage & Water Board, commenced the conducting of fault isolation tests, seeking, by process of elimination, to determine the location of the problem with Feeder 26. By that process, Mr. Talbot determined that the fault was apparently located in that portion of Feeder 26 which crosses the Mississippi River as above described.

4. While Mr. Talbot was on the west bank (Algiers) side of the river performing the fault isolation tests which ultimately led to the conclusion noted above, he sighted the dredge *Arkansas*, owned and operated by Williams–McWilliams Company. That vessel was then in the process of conducting dredging operations in the area of the cable crossing sign. Later, between 10:00 and 11:00 a. m., while performing fault isolation tests on the east bank (Bienville Street wharf) with his back to the cable crossing sign and looking out onto the river, Mr. Talbot again noted that the dredge *Arkansas* was operating in an area that was generally in line with the cable crossing sign located on the wharf building of the Bienville Street wharf.

5. At the time that Feeder 26 lost power, the dredge *Arkansas* was in operation and was performing routine maintenance dredging in the Mississippi River pursuant to a contract of Williams–McWilliams with, and under the joint direction, control and supervision of the United States of America, Department of the Army, New Orleans Division Corps of Engineers.

6. Later, on the same day hereinabove noted, and subsequent to the developments involving Mr. Talbot, Mr. Edward Arnold, Chief Electrical Engineer of the Sewerage & Water Board, sought permission and did, thereupon, board the *Arkansas* in the afternoon. He (Arnold) had been previously informed of Mr. Talbot's observations. Arnold notified the Corps' Inspector who was aboard the *Arkansas* of the alleged cable damage and was advised that the dredge logs indicated that the *Arkansas* was not dredging over the cable location when power was lost at the Algiers' station.

7. The testimony at trial indicated that there were no other vessels working or navigating on that particular part of the river at the time the cable lost its power.

8. On November 29, 1977, while Feeder 26 was being raised for inspection by John Hazard, dredging contractor, to determine what, if anything apparent, had caused the power interruption, it was discovered that the cable had experienced complete vertical penetration clearly sufficient to interrupt the power flow.

9. *Arkansas'* captain, Pelafigue, testified that at the pertinent time period the *Arkansas* was dredging at a depth of approximately 38 feet. He identified photographs of the *Arkansas'* two large swing anchors, which weigh approximately 7,000 pounds each, and testified that these anchors, when dropped in the course of the dredging operations, would not settle into the river's silt more than five feet and would not cause the type penetration hereinabove noted. He also stated the *Arkansas'* two dredging spuds, with eight inch bevelled bottoms, would not sink more than eight to nine feet into the river bottom and, likewise, would not cause the type penetration hereinabove noted. Furthermore, he testified that the anchor flukes and spud bottoms were too large to pierce the cable, but, rather, could do no more than mash down upon contact if there was any contact (which was denied).

10. Defendant's witness Olsen, an electrical engineer, testified that it would, in

his opinion, have been impossible for the large anchor fluke or dredging spuds of the *Arkansas* to have thus penetrated the cable and that her cutter head might have chewed the cable up and cut it in half but could not have penetrated it in the manner which was apparent upon examination of the raised cable.

11. Mr. Walter Speed, Chief Inspector for the Corps of Engineers, testified that his interpretation of the Corps' daily dredging logs showed that the *Arkansas* cutter head was located downstream of the cable crossing, the swing anchors were downstream of the cable crossing and the stern anchor was upstream of the cable crossing at the time of the casualty and that, accordingly, the *Arkansas* was blameless.

12. Plaintiff's expert, Mr. Arnold, testified in rebuttal that, considering the configuration of the penetration, it was possible for either the swing anchors or the stern anchor to have thus penetrated the cable.

13. The Sewerage & Water Board filed suit against Williams–McWilliams Company, the Hartford Insurance Company, its liability insurer, and the United States of America, Department of the Army, Corps of Engineers, claiming the dredge *Arkansas* caused the failure of Feeder 26 and sought damages in the amount of $614,915.90.

14. The basic factual issue in this case is whether an appurtenance of the dredge *Arkansas* struck the cable owned by the Sewerage & Water Board, causing it to be penetrated and put out of action.

15. The *Arkansas* was admittedly conducting dredging operations with various equipment that was in contact with the river bottom in the vicinity of the cable crossing at the time the cable lost power. The *Arkansas* was the only vessel dredging or navigating in any manner on that specific part of the river at that time.

16. The cable was damaged by an appurtenance of the dredge *Arkansas*, either by direct contact or as the direct result of contact with material on the river bottom as a direct result of the dredging activity of the *Arkansas* in that immediate area.

17. Plaintiff has prayed for damages in the amount of $614,915.90. This sum includes the cost of locating, raising and repairing the old cable and the installation of a new cable. The old cable was returned to service, after being repaired, in December, 1977. Plaintiff's expert, Mr. Olsen, testified that, after repair, the old cable should function as well as it did before it was damaged and, in fact, Feeder 26 did function as well as it had before the accident, at least for the period of its use subsequent to its repair and prior to the installation of a new cable.

18. A new cable was installed in February, 1980, to replace the old but effectively repaired Feeder 26. The decision to install a replacement cable had been anticipated by the Sewerage & Water Board as early as August, 1977, prior to the successful conducting of the repair operations noted above.

19. There was no showing that repaired Feeder 26 would not continue to function adequately, even though the Sewerage & Water Board is to be congratulated on its decision to replace the spliced cable as an added precaution against a loss of power for its facilities on the west bank.

20. The location of the feeder cable in the riverbed was not markedly inconsistent with its pre–accident charted location.

21. Plaintiff is entitled to an award of $193,928, based upon the following:

| | |
|---|---:|
| a. locating, raising, repairing and lowering Feeder 26; John J. Hazard Drayage & Construction Co., Inc., Invoice #1–77800 | $ 74,985 |
| b. locating, marking and plotting feeder location; John J. Hazard Co., Invoice #A–4619–1 | 1,625 |
| c. fathometer survey; John J. Hazard Co., Invoice #177800 | 2,560 |
| d. unit price work; John J. Hazard Co., Invoice #177800 | 14,593 |
| e. dredging; John J. Hazard Co., Invoice #177802 | 100,165 |
| | $193,928. |

## Conclusions of Law

1. When a moving vessel strikes a stationary object, there is a presumption that the collision or damage occurred due to the negligence of the moving vessel. See *Sewerage and Water Board of New Orleans et al. v. The Joe L. Hill et al.*, 118 F.Supp. 951 (E.D.La., 1954), affirmed in *Koch–Ellis Marine Contractors, Inc. v. Sewerage and Water Board of New Orleans et al.*, 218 F.2d 771 (5th Cir., 1955), *Southern Pacific Company v. Commercial Transport Corporation et al.*, 249 F.Supp. 377 (E.D.La.1966), *Brown and Root Marine Operations, Inc. v. Zapata Off–Shore Co.*, 377 F.2d 724 (5th Cir., 1967), and *Bunge Corporation v. M/V Furness Bridge et al.*, 558 F.2d 790 (5th Cir., 1977).

2. In order for the moving vessel to exonerate itself from liability in such instance, it must show that it was without fault or that the accident was occasioned by the fault of the stationary object or was the result of an inevitable accident. *Bunge Corp. v. M/V Furness Bridge*, supra.

3. The defendants contended that in the event the court found that the *Arkansas* had struck Feeder 26, that they should not be liable under the defense of "inevitable accident." The definition of this doctrine appears in the oft quoted *Grace Girdler*, 74 U.S. (7 Wall.) 196, 19 L.Ed. 113 (1869), where the court stated, 74 U.S. (7 Wall.) at p. 203, 19 L.Ed. at p. 116:

> "Inevitable accident is where a vessel is pursuing a lawful provocation in a lawful manner using the proper precaution against danger and an accident occurs."

However, I am obliged to conclude that defendants did not use proper precaution in conducting the dredging operations in the area of the cable crossing. A higher degree of care was required by them while dredging in that area since they knew or should have known that a cable lay beneath them and that it was possible for the *Arkansas'* equipment to damage the cable. The defendants failed to take the necessary precautions to prevent this accident from taking place.

4. Defendant, United States of America, contends there was no negligence on its part because Williams–McWilliams was an independent contractor and the Corps of Engineers had no control over the dredging operations. I do not find this to be so. The dredging operations were a joint project of Williams–McWilliams and the U. S. Army, Corps of Engineers. The Corps of Engineers directed where the dredging was to be done and there was an inspector for the Corps on board the *Arkansas* at all times during the operations. The interests and the functions of the two defendants in the dredging operations were so interwoven that I find that both parties were negligent in causing the damaging to Feeder 26.

5. Defendant, United States of America, further contends that in the event of liability on its part, that it should be indemnified by Williams–McWilliams under the term of the contract between them. The pertinent provision, Section SP–9(g) reads as follows:

> "The contractor shall release the Government and its officers and agents from all responsibility for damages to ... submerged and aerial crossings ... or other damages ordinarily covered by fire and marine insurance."

Williams–McWilliams contends that the above clause is not an agreement on their part to indemnify the government against its liability to third parties, but is nothing more than a "waiver of subrogation" clause.

I do not reach this issue. Even if the clause is construed to be an indemnification agreement, the language does not show an intention to include a situation where (as here) the damages occurred due to the joint negligence of Williams–McWilliams and the Corps of Engineers. A contractual provision should not be construed to permit an indemnitee to recover for his own negligence unless the court is firmly convinced that such an interpretation reflects the intention of the parties. *United States v. Seckinger*, 397 U.S. 203, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970); *Todd Shipyards Corp. v. Turbine Service, Inc.*, 467 F.Supp. 1257 (E.D.La. 1978); *Jurisich v. United Gas Pipe Line Co.*, 349 F.Supp. 1227 (E.D.La. 1972).

168

6. The defendants are liable to the plaintiff in solido in the amount of $193,928.

7. Plaintiff's counsel shall prepare a judgment consistent with these findings.